**COLSON SERVICES CORP., Plaintiff,**

v.

**INSURANCE COMPANY OF NORTH AMERICA, Defendant.**

**No. 92 Civ. 5814 (MGC).**

United States District Court,
S.D. New York.

Dec. 5, 1994.

**66**

Hart & Hume by Cecil Holland, Jr., New York City, for plaintiff.

Winston & Strawn by Edward N. Meyer, Steven B. Rissman, Anthony J. D'Auria, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

CEDARBAUM, District Judge.

This diversity action arises from a dispute over a commercial crime insurance policy ("Policy") issued by defendant Insurance Company of North America ("INA"), a Pennsylvania corporation, on behalf of plaintiff Colson Services Corporation ("Colson"), a New York corporation. Colson seeks to recover $4,327,771.87 under the Policy for a loss of money and securities which it alleges was caused by theft inside a banking premises. INA contends that the loss suffered by Colson is not covered by the Policy, and moves for summary judgment. Colson cross-moves for summary judgment.

For the reasons discussed below, INA's motion for summary judgment is granted, and Colson's motion for summary judgment is denied.

### Facts

The following facts are undisputed. Since about April of 1986, Colson has acted as fiscal and transfer agent, and collection and paying agent, for various clients. For the purpose of receiving and holding funds it collected on behalf of its clients, Colson maintained accounts with the trust department of the National Bank of Washington ("NBW"). One such account, Account # 1–825–12–7 (the "12–7 Account"), was maintained by the Institutional Assets division of NBW's trust department. Colson used that account to deposit funds which it received as fiscal agent on behalf of its clients. Pursuant to its agreements with certain clients, Colson was permitted to use the balances of its clients' funds in the 12–7 Account to make short-term investments. (JPTO ¶¶ 7–11.)

One of Colson's clients, the Small Business Administration ("SBA"), authorized Colson to make conservative overnight investments with the money held on its behalf in the 12–7 Account. The agreement between SBA and Colson provided that "no single investment that is not a direct obligation of the U.S. Government shall exceed $2.5 million," and that all non-governmental obligations shall be rated AAA by Moody's Investor's Service, Inc., or AAA by Standard & Poors Corporation. (Meyer Aff.Ex. I at 15; JPTO ¶ 12.) In addition, Colson agreed to indemnify SBA for any costs, liabilities, and expenses arising from Colson's negligence, breach of authority, breach of contract, or bad faith. (Meyer Aff.Ex. I at 17; JPTO ¶ 13.)

Colson authorized NBW to decide which overnight investments would be made with the funds in the 12–7 Account in accordance with certain guidelines. (Del Col Aff.Ex. 6.) In practice, Colson gave NBW complete discretion in choosing which investments to make with those funds. (JPTO ¶ 14.) Among the investments made by NBW on behalf of Colson were overnight purchases of commercial paper issued by Washington Bancorporation ("WBC"), NBW's corporate parent. (Id. ¶¶ 4, 16.) WBC commercial paper was not an approved investment pursuant to Colson's agreement with SBA because it was not a government obligation, nor was it rated by either Moody's or Standard and Poors. (Id. ¶ 17.)

During the first four months of 1990, Colson received from NBW, on practically a daily basis, confirmation slips and credit advices disclosing NBW's use of the funds in the 12–7 Account to purchase WBC commercial paper. (Id. ¶ 18.) The confirmation slips stated that "as agent we have sold to you" WBC commercial paper, and disclosed the amount, the interest rate, the maturity date, the price, and the trade date of the

WBC commercial paper sold. (Meyer Aff. Ex. M; JPTO ¶ 20.) In addition, NBW regularly provided to Colson copies of bank statements for the 12–7 Account which reflected the purchases of WBC commercial paper. (Meyer Aff.Ex. N; JPTO ¶ 22.)

From March 15, 1990 through May 4, 1990, NBW invested on behalf of Colson a daily average of approximately $9.7 million in WBC commercial paper. (JPTO ¶ 23.) During that time, WBC was reporting losses and its ratings were declining. (*Id.* ¶¶ 24–27, 29, 34.) On May 4, 1990, NBW used $9.1 million from the 12–7 Account to purchase, on behalf of Colson, WBC commercial paper. (*Id.* ¶ 35.) On May 7, 1990, WBC defaulted on its commercial paper obligations. (*Id.* ¶ 38.) Thereafter, Colson procured a $9.1 million loan to restore the amount in the 12–7 Account that had been used to purchase WBC commercial paper. (*Id.* ¶ 42.) On August 1, 1990, WBC filed for bankruptcy, and on August 10, 1990, NBW was placed in FDIC receivership. (*Id.* ¶¶ 44–45.)

Colson later filed a claim of loss with INA, and now sues to recover $4,327,771.87 under the Policy's Theft, Disappearance and Destruction Coverage Form. Although Colson alleges that its total loss was $11,786,762.68, it received $7,458,990.81 in settlement with the FDIC, and therefore seeks to recover the balance of $4,327,771.87 from INA. (Meyer Aff.Ex. Z.) INA contends that Colson is not covered for that loss pursuant to two exclusions in the Policy. In addition, INA urges that Colson's loss did not result from a theft, and that the loss did not involve "money or securities," as required under the Policy. Finally, INA argues that Colson failed to provide adequate notice of the loss in accordance with the Policy, and that requiring INA to cover Colson's loss would be against public policy.

### Discussion

Summary judgment is authorized when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P.

56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In examining the record, the court "must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Gibson v. American Broadcasting Cos., Inc.*, 892 F.2d 1128, 1132 (2d Cir. 1989); *see Celotex*, 477 U.S. at 330 n. 2, 106 S.Ct. at 2551 n. 2. The judge's role in summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

INA contends that even if Colson's loss could otherwise be covered by the Policy as a theft of money or securities, Colson cannot recover because the Policy expressly excludes losses resulting from any dishonest act committed by any of Colson's "authorized representatives." Paragraph D(1)(b) of the Theft, Disappearance and Destruction Coverage Form provides that:

> We will not pay for loss as specified below: ... **Acts of Employees, Directors, Trustees or Representatives:** Loss resulting from any dishonest or criminal act committed by any of your "employees," directors, trustees or authorized representatives: (1) Acting alone or in collusion with other persons; or (2) While performing services for you or otherwise.

(Meyer Aff.Ex. B at 10, ¶ D(1)(b).) INA argues that NBW, in making Colson's overnight investments, was "performing services for" Colson as its "authorized representative," and that therefore Colson's loss, which resulted from NBW's dishonest act of purchasing worthless commercial paper, is expressly excluded from coverage under the Policy. Colson responds that NBW was not its authorized representative and that therefore the exclusion does not apply.

The New York Court of Appeals has stated that:

> The principles governing interpretation of insurance contracts are well settled. Unambiguous provisions of a policy are given their plain and ordinary meaning. But where there is ambiguity as to the existence of coverage, doubt must be resolved

in favor of the insured and against the insurer. *Lavanant v. General Accident Insurance Company of America,* 79 N.Y.2d 623, 595 N.E.2d 819, 822, 584 N.Y.S.2d 744, 747 (1992). However, an ambiguity is not created simply because the parties to an insurance contract put forward different interpretations of its terms, particularly "where one of two competing constructions is strained or unnatural." *County of Schenectady v. Travelers Insurance Company,* 48 A.D.2d 299, 368 N.Y.S.2d 894, 897 (3d Dep't 1975); *see Connolly v. St. Paul Fire & Marine Insurance Company,* 198 A.D.2d 652, 603 N.Y.S.2d 611, 612 (3d Dep't 1993) (court should not "strain itself to find an ambiguity where words have a definite and precise meaning.") Finally, the terms of an insurance contract should be construed to effect "the reasonable expectation and purpose of the ordinary businessman." *Ace Wire & Cable Company, Inc. v. Aetna Casualty & Surety Company,* 60 N.Y.2d 390, 457 N.E.2d 761, 764, 469 N.Y.S.2d 655, 658 (1983); *see Thomas J. Lipton, Inc. v. Liberty Mutual Insurance Company,* 34 N.Y.2d 356, 314 N.E.2d 37, 39, 357 N.Y.S.2d 705, 708 (1974) (finding coverage because "[w]e cannot think that, given the economic and factual setting in which these policies were written, an ordinary businessman in applying for insurance and reading the language of these policies when submitted, would not have thought himself covered against precisely the damage claims now asserted...").

In discerning the plain and ordinary meaning of the term "authorized representative," its dictionary definition provides a useful starting point. *See Jakobson Shipyard, Inc. v. Aetna Casualty and Surety Company,* 961 F.2d 387, 389 (2d Cir.1992). A "representative" is defined as "one that represents another as agent, deputy, substitute, or delegate usu[ally] being invested with the authority of the principal." Webster's Third New International Dictionary (Unabridged) 1926–27 (1986). The word "authorized," in the context of the term "authorized representative," is defined as "endowed with authority." *Id.* at 147. Thus, it would appear that the dictionary definition of the term "authorized representative" would encompass an entity like NBW, which was given the authority by Colson to act as Colson's agent in choosing which investments to make each day with the money held in the 12–7 Account.

This conclusion is supported by Colson's Custody Agreement with NBW, which outlines Colson's understanding of its relationship with NBW with respect to the 12–7 Account. That agreement provides:

> WHEREAS, the Principal [Colson] desires to establish a Custody Account with the Custodian [NBW] for the purpose and upon the terms and conditions hereinafter set forth; and the Principal does hereby constitute and appoint the said [NBW] as its Custodian, with *full power and authority to do and perform all acts and things necessary and incidental to carrying out this Agreement....*

(Meyer Aff.Ex. E at 1) (emphasis added). In addition, in a complaint Colson filed against the FDIC in connection with NBW's use of Colson's funds to purchase WBC commercial paper, Colson alleged that "NBW acted as [Colson]'s agent and broker and had a fiduciary duty with respect to the 12–7 Account funds...." (Meyer Aff.Ex. C ¶ 97.) Those documents reflect Colson's understanding that NBW acted as its authorized representative in making Colson's overnight investment decisions.

Colson, however, asserts that "[NBW] had contracted [with Colson] only to provide certain limited services, namely to receive and hold certain funds in the [12–7 Account], to disburse those funds as instructed by Colson, and to invest the undisbursed portion of those funds overnight in accordance with Colson's guidelines." (Pl.Mem. in Support at 21.) From this, Colson argues that since NBW had a limited scope of authority and since NBW's investment in the risky WBC commercial paper was not authorized by Colson's guidelines, NBW was not acting as its authorized representative when it made that investment. Thus, while Colson concedes that NBW could be seen as its agent or representative, it contends that NBW was not its *authorized* representative. *See* Tr. June 30, 1994 at 3–4.

Colson's interpretation of the term "authorized representative," however, is far too limited and cannot be said to be in accordance with the expectations of an ordinary businessman. Indeed, according to Colson's limited definition, no representative of Colson could ever fit under the Policy's exclusion for "authorized representatives" because Colson could simply contend that any act of dishonesty committed by that representative had not been authorized.

Colson entered into an agreement with SBA, under which Colson was permitted to make conservative overnight investments with the money held in the 12–7 Account. Had Colson instructed one of its own employees to make the investment decisions each night and had that employee gone outside the guidelines that Colson had agreed with SBA to follow, it is clear that any resulting loss would fall under the exclusion. Colson's decision to endow NBW with the authority to make its investment decisions, and thereby to rely on NBW to honor Colson's agreement with SBA, should not change the result. Moreover, Colson could have chosen to monitor NBW more closely to ensure that it was exercising its authority appropriately, but chose not to do so.

Colson argues further that NBW was not its authorized representative because the term authorized representative is intended to cover only those persons "for whose acts an insured might be liable under the doctrine of *respondeat superior*...." (Pl.Mem. in Support at 20.) Colson offers no support for such a limited interpretation of the term authorized representative.

Finally, Colson argues that the exclusion for employees, directors, trustees, and authorized representatives in the Theft, Disappearance, and Destruction Coverage Form is included simply to avoid duplication of the coverage provided in the Employee Dishonesty Coverage Form. The Employee Dishonesty Coverage Form provides coverage for loss due to the dishonesty of any "employee." (Meyer Aff., Ex. B at 6 ¶ A(2).) Colson contends that "[s]ince no dishonesty by any employee of Colson is implicated in this claim, the exclusion is simply not applicable." (Pl.Mem. in Support at 20.)

If the exclusion and the Employee Dishonesty Coverage Form both used the terms "employees, directors, trustees, and authorized representatives," Colson's argument might be more persuasive. However, the Employee Dishonesty Coverage Form addresses only acts performed by "employees," a term defined by the Policy as excluding the insured's "agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character." (Meyer Aff.Ex. B at 4, ¶ C(1).) Accordingly, double coverage for acts committed by one of Colson's authorized representatives would be impossible in any event, and Colson's explanation for the exclusion thus seems implausible.

Because the loss suffered by Colson falls under the exclusion for dishonest acts committed by Colson's authorized representatives, the other arguments raised by INA need not be addressed.

For the foregoing reasons, INA's motion for summary judgment is granted, and Colson's motion for summary judgment is denied.

SO ORDERED.