USCA1 Opinion

 

 United States Court of Appeals For the First Circuit _____________________________ No. 97-1678 THE STOP & SHOP COMPANIES, INC., Plaintiff, Appellee, v. FEDERAL INSURANCE COMPANY,  Defendant, Appellant. ____________________ No. 97-1784 THE STOP & SHOP COMPANIES, INC., Plaintiff, Appellant, v. FEDERAL INSURANCE COMPANY,  Defendant, Appellee. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Patti B. Saris, U.S. District Judge] ___________________ ____________________ Before Selya, Circuit Judge, _____________ Coffin, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ ____________________ Leonard F. Clarkin with whom Harry C. Beach was on brief for __________________ ______________ Federal Insurance Company. Joseph L. Kociubes with whom Victor H. Polk, Jr., and Denise __________________ ___________________ ______ Jefferson Casper were on brief for The Stop & Shop Companies, ________________ Inc. Michael Roster, Michael H. Hudnall, Robert A. Lewis, and ______________ __________________ _______________ William Carpenter on brief for Stanford University Hospital, _________________ amicus curiae. ____________________ February 12, 1998 ____________________ -2- COFFIN, Senior Circuit Judge. This is an insurance coverage ____________________ dispute involving a crime insurance policy issued by Federal Insurance Company ("Federal") to Stop & Shop Companies, Inc. ("Stop & Shop"). Federal appeals the district court's finding that it must indemnify Stop & Shop for loss arising out of theft by officers of Hamilton Taft & Company ("Hamilton Taft"), a company employed by Stop & Shop to process and pay taxes. Federal also challenges the district court's calculation of damages, and Stop & Shop cross-appeals denial of its attorney's fees. We conclude that the authorized representative exclusion in the crime insurance policy bars recovery by Stop & Shop. We therefore reverse the district court's holding that Federal must indemnify Stop & Shop, and leave the attorney's fees decision intact. FACTUAL AND PROCEDURAL BACKGROUND The material facts are essentially undisputed. In February 1990, Stop & Shop purchased a crime insurance policy from Federal which provided coverage for "direct losses caused by the . . . disappearance, wrongful abstraction or Computer Theft of Money and Securities . . . ."1 The policy excluded coverage for loss due to the "[t]heft or any other fraudulent, dishonest or criminal act . . . by any [e]mployee, director, trustee or  ____________________ 1Insuring Clause 2 provides coverage for such loss within or from the premises or banking premises; insuring clause 3 provides for coverage from such loss "outside the premises, while being conveyed by the Insured, . . . or any other person duly authorized by the Insured to have custody thereof. . . ."  -3- authorized representative of the Insured whether acting alone or in collusion with others." Because we find that the issue in this case turns on the exclusion clause, we detail only briefly the somewhat unusual circumstances surrounding the losses suffered by Stop & Shop.  Stop & Shop entered into a tax service agreement in 1987 with Hamilton Taft, by which Stop & Shop would deposit funds with Hamilton Taft and Hamilton Taft would then use these funds to remit timely payments to taxing authorities on behalf of Stop & Shop. The agreement allowed Hamilton Taft to commingle Stop & Shop funds with deposits from other customers and to use the money for its own investments and expenses so long as tax payments owed by Stop & Shop were made when due. In 1989, Connie Armstrong assumed control of the company, becoming Hamilton Taft's sole shareholder, director and chief executive officer.  In 1990, Stop & Shop renewed its contract with Hamilton Taft, after making certain revisions. These included changing the language, "This agreement may not be assigned to persons who are not employees of Hamilton Taft" to "This agreement may not be assigned by Hamilton Taft."  In the relevant period for this case, Stop & Shop had tax payments due on October 18, 1990, October 25, 1990, January 17, 1991, and January 24, 1991, totalling $5,257,474 for October, and $7,632,269 for January. On these dates, Hamilton Taft employees prepared the checks and recorded them as payments made in their accounting logs. As was standard practice with amounts in excess -4- of $100,000, the checks were then sent to the front office for an officer's counter-signature. The checks were not, however, mailed in the required period of time.  Upon discovering that its October and January tax payments had not been made, Stop & Shop contacted Hamilton Taft, which ultimately responded by paying the October liability on January 31, 1991, and the January liability on March 8, 1991. Around the same time, a former Hamilton Taft comptroller reported to about thirty Hamilton Taft clients that the company's executives, most notably Armstrong, were diverting client funds intended for tax payments and using these funds for their personal use or for investment in other Armstrong-owned companies. In late March, three Hamilton Taft clients petitioned the company into involuntary bankruptcy, and a Trustee was appointed. The Trustee calculated the loss from improper diversion of client funds at over $55 million. In January 1992, the Trustee demanded that Stop & Shop repay the bankrupt estate for the January and March 1991 tax payments made by Hamilton Taft, arguing that these payments were voidable preferences.2   ____________________ 2The Bankruptcy Code allows a bankruptcy trustee to: . . . avoid any transfer of an interest of the debtor in property -- (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made -- (A) on or within 90 days before the date of the filing of the petition . . . 11 U.S.C. 547(b). -5- Litigation proceeded in federal court in California, where the Ninth Circuit ultimately agreed that the January and March payments were voidable preferences subject to repayment. Shortly thereafter, Stop & Shop settled with the Trustee for a portion of its tax liability. It then filed a claim in district court for indemnification by Federal for its remaining loss; upon Federal's motion for a transfer of venue, the case was moved to Massachusetts. Federal argued that it had no obligation to indemnify because Stop & Shop's loss was not direct and the policy's authorized representative exclusion barred recovery for theft perpetrated by Hamilton Taft executives. The district court found direct loss and held the exclusion inapplicable. The court then awarded damages to Stop & Shop but denied its request for attorney's fees. Each side appeals.  DISCUSSION Although the parties raise multiple issues on appeal, our conclusion on the exclusion clause issue makes it unnecessary to discuss the remaining ones. We therefore begin with Federal's claim that the clause bars coverage, and Stop & Stop's response that the clause is inapplicable because the responsible Hamilton Taft executives diverted funds for their personal gain and not for the benefit of the company. Construction of insurance contracts and application of their terms to facts are matters of law, which we review de novo. __ ____ Preferred Mut. Ins. Co. v. Travelers Co., 127 F.3d 136, 137 (1st ________________________ _____________ -6- Cir. 1997). Exclusionary clauses must "state clearly what items are to be excluded and any ambiguity is to be interpreted strictly in the insured's favor." American Home Assur. Co. v. _________________________ Libbey-Owens-Ford Co., 786 F.2d 22, 28 (1st Cir. 1986) (applying, _____________________ as we do here, Massachusetts law). Ambiguity exists where the language is susceptible to more than one rational interpretation. Mt. Airy Ins. Co. v. Greenbaum, 127 F.3d 15, 19 (1st. Cir. 1997). _________________ _________ But where the policy's language is plain, we interpret and enforce it according to the ordinary meaning of the words contained in the policy's provisions. Bird v. Centennial Ins. ____ _______________ Co., 11 F.3d 228, 232 (1st Cir. 1993); Cody v. Connecticut ___ ____ ___________ General Life Ins. Co., 387 Mass. 142, 146, 439 N.E.2d 234, 237 ______________________ (1982). "[L]ack of ambiguity is a relative status, not an absolute one. . . . [I]t is sufficient if the language employed is such that a reasonable person, reading the document as a whole and in a realistic context, clearly points toward a readily ascertainable meaning." Fashion House, Inc. v. K Mart Corp., 892 ___________________ ____________ F.2d 1076, 1085 (1st Cir. 1989). The question for us is whether the actions of Hamilton Taft executives in diverting funds for their own gain fall under Federal's authorized representative exclusion. The district court found that the term "authorized representative" was ambiguous based on several factors: it was not defined in either the policy or case law, other crime insurance contracts included express terms excluding coverage, the parties' course of conduct in amending the Agreement suggested their specific intention that -7- Hamilton Taft and not Armstrong be Stop & Shop's authorized representative, and no public policy reasons precluded coverage. Resolving the ambiguity in favor of the insured, the court therefore determined that Stop & Shop was covered under the policy for the losses sustained.  We find each of these reasons lacking in force and conclude that the language in context is susceptible to only one definition, exclusion of coverage. In the absence of a statutory definition, or any relevant state law construction of the term, we begin by turning to the lexical meaning, as Massachusetts courts frequently do, see, e.g., Gordon v. Safety Ins. Co., 417 _________ ______ ________________ Mass. 687, 690, 632 N.E.2d 1187, 1189 (1994), and to a thoughtful federal case, Colson Services Corp. v. Ins. Co. of North America, _____________________ _________________________ 874 F. Supp. 65 (S.D.N.Y. 1994), which provide us with thorough and specific explanations of the term. Black's Law Dictionary _______________________ 133-34 (6th ed. 1990) defines "authorized" as possessed of control or power delegated by a principal to his agent, and "representative" as "a person or thing that . . . in some way corresponds to, stands for, replaces, or is equivalent to, another person or thing. . . . includ[ing] an agent, an officer of a corporation or association . . . or any other person empowered to act for another," id. at 1302. Webster's Third New ___ ___________________ International Dictionary (Unabridged) 146 (1966) defines __________________________ "authorized," inter alia, as "endorse[d], empower[ed]," and _____ ____ "representative" as "standing for or in the place of another: action for another or others: constituting the agent for another -8- especially through delegated authority," id. at 1926-27. The ___ court in Colson relied on the Webster's meaning, concluding that ______ _______ a company given authority by another company to act as its agent in choosing investments was an "authorized representative" under the relevant crime insurance policy. 874 F. Supp. at 68. These definitions persuade us that an "authorized representative" can be either a person or company empowered to act on an entity's behalf. Stop & Shop accepts this definition, but insists that in this case only Hamilton Taft was its authorized representative and that individuals who behave inconsistently with the interests of Hamilton Taft, such as the executives who committed the theft here, cannot fall under the exclusion.  We repeat at the threshold the fundamental premise that, while a corporation does have a noncorporeal and independent existence, it can conduct its affairs only through its officers and employees. See Holmes v. Bateson, 583 F.2d 542, 560 (1st ___ ______ _______ Cir. 1978). Thus, where Hamilton Taft is conceded to be Stop & Shop's authorized representative, it must also be conceded that Hamilton Taft may carry out its obligations to Stop & Shop only through the acts of its officers and employees. Given this, we must consider whether the term omits acts by individuals acting for their own benefit. Stop & Shop argues that the authorized representative exclusion is at minimum ambiguous on this point because the policy does not delineate its scope, as other policies have done -9- in the context of employee exclusion clauses. Before addressing the specifics of this argument, we emphasize that it stretches the notion of ambiguity to conclude that language is ambiguous because of something that is not said. Definitions of ambiguity require examination of the language employed, see, e.g., Fashion ________ _________ _______ House, 892 F.2d at 1085, not the language omitted. With some _____ hesitancy therefore we address Stop & Shop's argument that ambiguity exists because the exclusion does not, after "authorized representative," contain the language, "while working or otherwise."  A careful review of the cases cited for this proposition reveals their constant thrust, and the inappropriateness of their use in the instant case. For they all actually turn on the temporal scope of the action -- specifically, whether the theft ________ was committed outside of working hours -- rather than the nature of authority given or the type of behavior involved. See, e.g., _________ Citizens Ins. Co. of New Jersey v. Kansas City Commercial ___________________________________ ________________________ Cartage, Inc., 611 S.W.2d 302, 309-11 (Mo. Ct. App. 1980); Del _____________ ___ Vecchio v. Old Reliable Fire Ins. Co., 132 N.J. Super 589, 594- _______ ___________________________ 96, 334 A.2d 394, 397-98 (1975); Sehon, Stevenson & Co. v. ________________________ Buckeye Union Ins. Co., 298 F. Supp. 1168, 1169-70 (S.D.W. Va. _______________________ 1969); Century Indem. Co. v. Schmick, 351 Mich. 622, 627-28, 88 ___________________ _______ N.W.2d 622, 624-25 (1958).3 These cases have found that theft by  ____________________ 3In Colson, 874 F. Supp. 65 (S.D.N.Y. 1994), also cited for ______ this proposition, the applicable policy excluded acts by an authorized representative "while working or otherwise," but the case never discussed and in no way turned on the meaning of this clause. Rather, the Colson court explored only the definition of ______ -10- employees after their shift is over -- in other words, after the period of time during which they are actively working for their employer -- falls under an employee theft exclusion only where the "while working or otherwise" language is included in the policy. Other cases have taken the contrary position, but we do not discuss them, as we find this entire line of cases inapposite. We are not involved here with when the diversion of ____ funds occurred; certainly no argument has been made that the fraud was perpetrated at any time other than during working hours. Nor would it make sense to think of a corporate authorized representative as having working hours. Indeed, to the extent they are relevant, the employee exclusion cases support Federal's contention that, for the purposes of determining coverage, it is irrelevant whether the wrong is perpetrated for the benefit of Hamilton Taft or the individual.4 Even the cases applying a temporal restriction assume that if the temporal scope is satisfied, all inappropriate ___ use of funds is included under the exclusion, irrespective of who  ____________________ the term "authorized representative" in an effort to determine whether an investment company that made bad investments for the insured fell under the applicable crime insurance policy's authorized representative exclusion. Id. at 67. As the case ___ neither relied on the "while working or otherwise" language nor concerned acts by individuals, it does not support Stop & Shop's arguments. 4While Federal and Stop & Shop's dispute concerns application of the term "authorized representative" rather than "employee," we agree with Stop & Shop that the way "employee" exclusions have been interpreted is instructive as we consider how to construe the scope of the authorized representative exclusion. -11- benefits from the improper use. None of these cases so much as queries whether an employee who steals for himself, rather than to add to the company's coffers, does not therefore fall under the exclusion.  As evidence in support of its construction, Stop & Shop makes much of its 1990 modification to the Tax Service Agreement. Instead of adopting the standard language of Hamilton Taft's pre- printed form, stating that the agreement "may not be assigned to persons who are not employees of Hamilton Taft," Stop & Shop revised the clause to provide that the agreement "may not be assigned by Hamilton Taft." The district court agreed that this change indicated that Stop & Shop intended that no entity other than Hamilton Taft could be the authorized representative. This conclusion requires reading too much between the lines. The record contains no evidence of the context in which the contract revision was made, nor gives any clue as to why it was implemented. We see no relationship between the revision and an understanding of the term "authorized representative."  Hamilton Taft can act only through its officers and employees, and the reality is that the grant of authority to the executives of Hamilton Taft enabled their diversion of funds. When we consider, too, that employee exclusion clauses have been construed to encompass theft for personal benefit, and that the policy excludes illegal acts by employees, directors or authorized representatives without distinguishing between these groups, the intent of the exclusion is most readily understood as -12- an effort to bar coverage of wrong committed by persons who have been granted access to the corporate funds. Nor do public policy concerns play an obvious role here. The district court, while conceding that the dispute in this case turns wholly on an interpretation of a contract clause and not on an equitable allocation of risk between innocent parties,5 felt vicarious liability-agency law provided useful guidance. Some Massachusetts cases have found companies liable for the illegal actions of their employees only where the employees act for the companies' benefit rather than for their own. See Kansallis ___ _________ Finance Ltd. v. Fern, 421 Mass. 659, 665-69, 659 N.E.2d 731, 734- ____________ ____ 37 (1996) (reviewing existing case law). We do not pursue here the conflict in the case law on this issue, as we disagree with the district court's assessment that these cases provide a useful context for understanding the present situation. These cases turn on equitable allocation of the financial burden resulting  ____________________ 5Federal seeks to apply the alter ego doctrine in furtherance of its argument; agreeing with Stop & Shop, the district court found the doctrine inapplicable to this case. We see no need to ground refusal of coverage in this complex doctrine, which is based on the equitable allocation of liability. Indeed, to apply it would turn equitable allocation on its head, for it was Stop & Shop, not Federal, whose choice of Hamilton Taft gave Armstrong access to the diverted funds.  We are not faced here with equitable, public policy concerns about placing responsibility on the guilty, or more culpable, party, nor are we presented with a need to find an extraordinary way to impose liability on a generally untouched party. This case does not involve a creditor seeking to hold an individual liable for misuse or theft of funds, nor does it seek to guarantee that a wrongdoer company does not recover under an insurance policy for abuse perpetrated by its own officer, director or shareholder. Hamilton Taft is not a party to this action, and its liability for the misappropriation of funds is not at issue here.  -13- from bad acts by officers or employees. Where a creditor or third party suffers at the hands of such a person, and the company somehow ratified the improper act or gave its express authority to perpetrate fraud, it makes equitable sense for the company to pay. It is equally true that where a maverick officer or employee perpetrates fraud against the company's interest and without the company's express or implied knowledge, it may be unfair to hold the company liable. We are not concerned here with a determination of whether the corporation Hamilton Taft should be liable to a creditor for the wrongful acts of its employees. It may be that Stop & Shop suffered a loss at the hands of Hamilton Taft employees for which it deserves compensation. But Stop & Shop's insurer, Federal, who was not party to the fraud, has no responsibility to reimburse for losses suffered unless those losses are contractually covered.  If we were to hold, as Stop & Shop's argument would have us do, that an insurance company must bear the full cost of theft only when it was committed by an individual working for the insured company's authorized representative but acting contrary to the representative's interest, the exclusionary clause, insofar as it deals with the authorized representative, wouldn't accomplish much. The policy underlying the exclusion clause, which includes, without distinction, employees, directors, trustees and authorized representatives, is most readily understood as an effort to place on the insured the risk of picking a faithless agent. It makes little sense for the -14- exclusion clause to encompass self-interested acts on the part of employees, but not on the part of those working for the authorized representative.6  We come full circle, then, to the contract. The exclusion clause specifically states that the crime insurance policy does not cover theft by an authorized representative. The policy does not restrict the scope of "authorized representative" to acts benefitting Hamilton Taft, the record contains no evidence that such a restriction was contemplated, and no case law applies such a restriction. In sum, although exclusion clauses are to be narrowly construed, we find no basis for imposing the proposed limit. In the absence of legally cognizable ambiguity, we enforce the ordinary meaning of the words. Bird, 11 F.3d at 232. ____ It is most sensible to consider "authorized representative" as one of a series of capacities in which an individual who commits theft may have been given access to funds by the insured. We see use of the term as a straightforward effort to embrace all statuses that are "authorized," and thus are the insured's responsibility to supervise. Because Hamilton Taft can act only through its officers, we must construe this exclusion to encompass generally acts by the officers of Hamilton Taft. As  ____________________ 6Theft and misappropriation of funds -- acts covered by crime insurance policies -- are by their very nature most likely to be committed for individual rather than corporate benefit. Certainly, an authorized representative company may, for its own benefit, steal an insured company's funds, but we think by far the more likely scenario is that a person with access to funds through their employment position will risk illegally acquiring these funds for personal profit. -15- officers of the corporate representative, Armstrong and others were given access and power to divert funds.7 Finding that the diversion of funds by officers of Hamilton Taft falls under Federal's authorized representative exclusion policy, we reverse the district court decision, and need not _______ reach the direct loss and damages questions raised on appeal. As we find Stop & Shop is not covered under Federal's policy, we deny its cross-appeal for attorney's fees. ____ It is so ordered. ________________  ____________________ 7This is particularly true where, as here, the officers were the only persons who could have perpetrated the fraud, because they alone were endowed with the authority to co-sign checks over $100,000. -16-