174 F.3d 1077
 99 Cal. Daily Op. Serv. 3031, 1999 Daily
Journal D.A.R. 3924
STANFORD UNIVERSITY HOSPITAL, Plaintiff-Appellee,
v.
FEDERAL INSURANCE COMPANY, Defendant-Appellant.
Verbatim Corporation, Plaintiff-Appellee,
v.
Federal Insurance Company, Defendant-Appellant.
Glendale Adventist Medical Center, Plaintiff-Appellee,
v.
Federal Insurance Company, Defendant-Appellant.
 Nos. 97-16487 to 97-16489.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 17, 1998.
Decided April 28, 1999.
 
 1
 Gary J. Valeriano, David T. DiBiase, Anderson, McPharlin & Conners LLP, Los Angeles, California, and Peter W. Davis, Joseph P. Mascovich, Crosby, Heafey, Roach & May, Oakland, California, for the defendant-appellant.
 
 
 2
 Robert A. Lewis, McCutchen, Doyle, Brown & Enersen, San Francisco, California; Michael H. Bierman, Tuttle & Taylor, Los Angeles, California; Daniel Bergeson, Bergeson, Eliopoulos, Grady & Gray, San Jose, California, for the plaintiff-appellee.
 
 
 3
 Appeal from the United States District Court for the Northern District of California; Claudia Wilken, District Judge, Presiding. D.C. Nos. CV-93-0563 CW, CV-93-1877 CW, CV-93-2653 CW.
 
 
 4
 Before: CANBY and KLEINFELD, Circuit Judges, and KEEP, District Judge.[1]
 
 KEEP, District Judge:
 
 5
 This case stems from a dispute over coverage under crime insurance policies issued by defendant Federal Insurance Company ("Federal") to Stanford University Hospital ("Stanford"), Verbatim Corporation ("Verbatim"), and Glendale Adventist Medical Center ("Glendale") (hereinafter collectively referred to as "plaintiffs"). Plaintiffs entered into payroll tax service agreements with Hamilton-Taft & Co. ("Hamilton-Taft") requiring that Hamilton-Taft make timely tax payments on their behalf. Plaintiffs seek indemnification for losses resulting from the misappropriation of funds by Connie "Chip" Armstrong, Jr. ("Armstrong"), Hamilton-Taft's sole shareholder and director. Federal denied plaintiffs' claims, and plaintiffs filed separate lawsuits in order to receive payments. The three suits ultimately were handled jointly by Judge Claudia Wilken.
 
 
 6
 Defendant Federal appeals the district court's July 7, 1997 judgment ("Judgment") and March 8, 1995 order granting summary judgment in favor of plaintiffs Stanford, Verbatim, and Glendale. In the July 7, 1997 order, Judge Wilken entered judgment in favor of Stanford for $3,396,960.15, Verbatim for $260,631.91, and Glendale for $772,617.88 in addition to awarding post-judgment interest pursuant to 28 U.S.C. § 1961. On August 1, 1997, Federal filed its appeal of the Judgment and the March 8, 1995 order. Plaintiffs filed cross-appeals, which they subsequently dismissed. This court has jurisdiction to hear the appeals pursuant to 28 U.S.C. § 1291. Because the three cases are related, the court will treat Federal's appeal in each case jointly, even though the appeals have not been consolidated. This court, hereby, REVERSES and REMANDS the district court's grant of summary judgment.
 
 I. BACKGROUND
 
 7
 Plaintiffs Stanford, Verbatim, and Glendale are non-profit corporations. Defendant Federal is an insurance company that is a member of the Chubb Group of Insurance Companies.
 
 A. The Payroll Tax Service Agreements
 
 8
 Plaintiffs entered into Payroll Tax Service Agreements ("TSAs") with Hamilton-Taft: Stanford on October 12, 1983; Verbatim on December 4, 1981; and Glendale in 1983. Hamilton-Taft was a San Francisco-based company that offered a variety of payroll tax services to employers. In essence, the TSAs required that Hamilton-Taft make timely payroll tax payments on behalf of the plaintiffs and prepare and file required payroll tax forms and reports. The TSAs required that the plaintiffs deliver timely payroll information to Hamilton-Taft and provide Hamilton-Taft with the tax deposit funds to make the payments: Stanford was required to transmit these funds within one calendar day of the tax due date; Glendale was required to transmit the funds on the tax due date; and Verbatim gave Hamilton-Taft authority to debit its accounts directly for the funds needed as tax payments. In exchange for Hamilton-Taft's services, plaintiffs paid Hamilton-Taft a fee and allowed Hamilton-Taft to derive benefits from the use of the money during the "float period," the time between when the funds were transmitted and when the taxes had to be paid.
 
 
 9
 Under this arrangement, Hamilton-Taft operated independently, and the plaintiffs granted Hamilton-Taft substantial control over their tax payments and funds. For example, Hamilton-Taft was permitted to commingle its clients' funds. Among other powers, Verbatim granted Hamilton-Taft "full authority to represent and submit records on [its] behalf ... before Federal, State, or local jurisdiction's tax office with respect to payroll taxes." On October 11, 1989, Verbatim also filed an Internal Revenue Service (IRS) Form 2848-D, entitled "Tax Information Authorization and Declaration of Representative," appointing Hamilton-Taft as its representative. In its TSA, Stanford required that Hamilton-Taft deposit necessary taxes and prepare all required tax forms and reports on its behalf. Stanford also filed an IRS Form 2848-D, thereby authorizing Hamilton-Taft to receive or inspect confidential tax information as Stanford's representative before the IRS.[2] Glendale granted Hamilton-Taft similar powers in the TSA, filed an IRS Form 2848-D, and also filed an IRS Form 2848, entitled "Power of Attorney and Declaration of Representative," in which Glendale granted Hamilton-Taft the right to act as its attorney-in-fact before the IRS.
 
 
 10
 The Stanford and Glendale TSAs also required that Hamilton-Taft carry its own fidelity bond to protect its clients against "dishonesty or fraud by employees of Hamilton Taft." Hamilton-Taft carried such a bond with Lloyds, with primary coverage of $20 million and umbrella coverage of $30 million.
 
 
 11
 In January of 1988, MaxPharma, Inc. acquired Hamilton-Taft. MaxPharma proceeded to divert approximately $18 million of client tax deposit money to itself. According to the parties, Connie "Chip" Armstrong, Jr. learned of this diversion, bought several hundred dollars worth of MaxPharma stock, and brought a shareholder fraud action against MaxPharma. In a peculiar settlement of the suit, MaxPharma transferred ownership of Hamilton-Taft to Armstrong, who thereupon became its sole shareholder and director.
 
 
 12
 Armstrong continued to divert clients' funds with the assistance of Hamilton-Taft officers and employees such as Hamilton-Taft president Richard A. Fowles. Armstrong and his cohorts misappropriated millions of dollars of clients' funds between 1989 and 1991 by diverting money from selected accounts. Armstrong perpetrated this fraud by creating a Ponzi scheme. He and other employees would remove checks that had been prepared to be sent to the proper taxing authority from the mailing system. The funds from that check would then be transferred electronically from Hamilton-Taft's accounts to the accounts of other companies owned by Armstrong. To prevent the diversion of funds from being discovered, the taxes and related late-payment penalties would later be paid from funds diverted from other clients' accounts.
 
 
 13
 In March of 1991, Steven Solodoff, a former Hamilton-Taft controller, exposed the Armstrong scheme to law enforcement agencies, the press, and some Hamilton-Taft clients. Three of Hamilton-Taft's clients, Stanford, Stanford University, and Federal Express, immediately filed an involuntary Chapter 11 petition against Hamilton-Taft, and, on their motion, a trustee was appointed. In a Declaration, Solodoff estimated that Armstrong along with twenty (20) of Hamilton-Taft's eighty (80) employees used this scheme to divert approximately $95.7 million for their personal benefit, for Hamilton-Taft luxury expenses, and to Armstrong's other companies. Solodoff estimates that half of Hamilton-Taft's employees knew of the scheme.
 
 
 14
 On May 28, 1991, the bankruptcy trustee issued a First Interim Report in which he outlined the extent of the misappropriation: (1) Hamilton-Taft owed its clients $90.9 million for unpaid taxes; (2) Hamilton-Taft had $5.8 million in cash available; (3) of the shortfall, $15.9 million was attributable to the MaxPharma era; (4) $55.2 million had been transferred to Armstrong's other companies; (5) $8.4 million was used to pay tax penalties caused by the diversion of funds; and (6) $5.5 million was used to fund Hamilton-Taft's operating expenses in excess of its earnings. The money diverted to Armstrong's companies was used to pay for extravagant personal expenses and to pay for Hamilton-Taft corporate luxuries like $400,000 for skyboxes at the Dallas Cowboys stadium and $250,000 for maintenance of a suite at the Mark Hopkins Hotel.
 
 
 15
 The trustee's report indicates that members of upper management, such as president Richard Fowles and vice presidents Al May and Joseph Maitless, were aware of the scheme, perpetuated it, and facilitated its cover-up from clients. The trustee issued two further reports which corroborated the trustee's conclusions about Armstrong's misappropriation of funds; the trustee commenced an adversary proceeding against Armstrong and his companies in order to recover the transferred property as fraudulent conveyances and to recover damages for conversion, breach of fiduciary duty, and breach of contract. In the proceedings to determine damages, the Honorable Charles A. Legge found Armstrong to be in privity with Hamilton-Taft for purposes of collateral estoppel and in sole control of Hamilton-Taft such that he could be held liable as a fiduciary to the corporation or to its creditors.
 
 B. The Crime Insurance Policy
 
 16
 Plaintiffs obtained crime insurance policies from Federal: Stanford purchased the policy in 1987; Verbatim obtained its policy on September 10, 1990; and Glendale purchased its policy on November 1, 1990. Plaintiffs never provided Federal with information about their contractual relationships with Hamilton-Taft. The crime insurance policy contains, among other provisions, employee theft coverage, premises coverage, and transit coverage. These provisions are identical in all three policies. The district court held that plaintiffs were covered by the premises and transit clauses.[3]
 
 
 17
 The premises coverage provides, in part, as follows:
 
 
 18
 The Company shall be liable for direct losses caused by the actual destruction, disappearance, wrongful abstraction or Computer Theft of Money and Securities within or from the Premises, Banking Premises or night depository chute or safe maintained by any bank or trust company.
 
 
 19
 Stanford's policy at § 1.2. The transit coverage provides, in part, as follows:
 
 
 20
 The Company shall be liable for direct losses caused by the actual destruction, disappearance or wrongful abstraction of Money and Securities outside the Premises, while being conveyed by the Insured, a partner, an Employee, an armored motor vehicle company or any other person duly authorized by the Insured to have custody thereof or while temporarily within the home of the Insured, a partner, an Employee or any such other person.
 
 
 21
 Id. at § 1.3. These clauses are subject to the exclusions in the crime insurance policies. The "authorized representative" exclusion at issue in this case, which is identical in all three policies, reads as follows:
 
 
 22
 Coverage under [the premises and transit insuring clauses] does not apply to loss or damage: ... due to Theft or any other fraudulent, dishonest or criminal act (other than Safe Burglary or Robbery or attempt thereat [sic] ) by any Employee, Director, trustee or authorized representative of the Insured whether acting alone or in collusion with others ....
 
 
 23
 Id. at § 2.3(B) (emphasis added).
 
 
 24
 After discovering the misappropriation of their funds, plaintiffs filed claims with Federal.[4] Federal denied their claims, and the plaintiffs proceeded to file suit.
 
 C. District Court's Rulings
 
 25
 The district court's March 8, 1995 Order Granting Plaintiffs' Motions for Partial Summary Judgment and Denying Defendant's Motions for Summary Judgment held that plaintiffs' losses as a result of Armstrong's misappropriation of their funds are covered by the premises and transit coverage provisions of their crime insurance policies. The district court found that Hamilton-Taft was an "authorized representative" for Verbatim and Glendale; however, relying heavily on this court's ruling in FDIC v. O'Melveny & Meyers, 969 F.2d 744, 750 (9th Cir.1992), rev'd on other grounds, 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), the district court ruled that plaintiffs' coverage is not barred by the "authorized representative" provision because the actions of those who embezzled funds could not be imputed to Hamilton-Taft given that their actions were undertaken for their personal benefit and not for the benefit of Hamilton-Taft.
 
 
 26
 In the same order, the district court also ruled that plaintiffs' recovery under their policies is not barred by their failure to disclose their relationships with Hamilton-Taft. In support of this conclusion, the district court found that the application for the crime insurance policy did not elicit this information and that there was no evidence of deliberate concealment on the part of plaintiffs. Federal appeals the district court's rulings in the March 8, 1995 and March 11, 1997 orders.[5]
 
 II. STANDARD OF REVIEW
 
 27
 This court reviews a district court's grant of summary judgment de novo. Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir.1998). Viewing the evidence in the light most favorable to the non-moving party, the appellate court determines whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. See id. The meaning and interpretation of an insurance contract is a question of law reviewed de novo. See Blue Ridge Ins. Co. v. Stanewich, 142 F.3d 1145, 1147 (9th Cir.1998).
 
 III. DISCUSSION
 
 28
 The gravamen of this case lies in the interpretation of the term "authorized representative" in the exclusion section of the crime insurance policies. This term is not defined in the policies. The court must apply California law to resolve issues of state contract law. See 28 U.S.C. § 1652. In order to define the term "authorized representative" under California law, the court must first look to the plain language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it. See Cal. Civ.Code § 1638; Reserve Ins. Co. v. Pisciotta, 30 Cal.3d 800, 807, 180 Cal.Rptr. 628, 640 P.2d 764 (1982). Coverage provisions are construed broadly in favor of the insured, and exclusions are construed narrowly against the insurer. See Garvey v. State Farm Fire & Cas. Co., 48 Cal.3d 395, 406, 257 Cal.Rptr. 292, 770 P.2d 704 (1989) (en banc). Exclusionary clauses must be conspicuous, plain and clear. They need not, however, be grammatically perfect; if the intent of the exclusion is clear, it will be enforced. See Cal. State Auto. Ass'n Inter-Ins. Bureau v. Warwick, 17 Cal.3d 190, 195, 130 Cal.Rptr. 520, 550 P.2d 1056 (1976).
 
 
 29
 The language of the contract must be interpreted as a whole and in the circumstances of the case. See Bank of the West v. Superior Court, 2 Cal.4th 1254, 1265, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992). A policy provision will be considered ambiguous only when it is capable of two or more constructions, both of which are reasonable. See Bay Cities Paving Grading, Inc. v. Lawyers' Mutual Ins. Co., 5 Cal.4th 854, 867, 21 Cal.Rptr.2d 691, 855 P.2d 1263 (1993).
 
 
 30
 A. Hamilton-Taft as an Authorized Representative
 
 
 31
 In its March 8, 1995 order, the district court found that Hamilton-Taft operated as the "authorized representative" for Verbatim and Glendale. The district court based this finding on the fact that both Verbatim and Glendale granted Hamilton-Taft authority to represent and submit records on their behalf before Federal, State, or local jurisdictions' tax offices with respect to payroll taxes. As noted previously, both also filed IRS Form 2848-D, entitled "Tax Information Authorization and Declaration of Representative," appointing Hamilton-Taft as their representative. In addition, Glendale also filed an IRS Form 2848, entitled "Power of Attorney and Declaration of Representative," in which Glendale granted Hamilton-Taft the right to act as its attorney-in-fact before the IRS.
 
 
 32
 However, the district court found that "Stanford did not appoint Hamilton Taft as its representative." The district court did not provide a reason for this conclusion. Contrary to the district court's conclusion, this court finds that Stanford did authorize Hamilton-Taft to act as its representative before the appropriate tax authorities for the purposes of payroll taxes. Just like Glendale's TSA, the provisions of Stanford's TSA required that Hamilton-Taft deposit necessary taxes and prepare all required tax forms and reports on Stanford's behalf. Furthermore, Stanford filed IRS Form 2848-D which authorized Hamilton-Taft to act as its representative before the IRS for payroll tax purposes. Based on a plain interpretation of the term and on the criteria used by the district court to determine that Hamilton-Taft was an authorized representative for Verbatim and Glendale, we hold that Hamilton-Taft was also an authorized representative for Stanford.
 
 
 33
 Inherent in Hamilton-Taft's status as an authorized representative for tax purposes is its authority to possess and disburse the funds of Stanford, Glendale and Verbatim in carrying out that duty. Its authorized access to these funds, on the premises of the insured or in transit, thus rendered it an "authorized representative" within the meaning of the theft policy's exclusionary clause.
 
 
 34
 B. Armstrong as an Authorized Representative
 
 
 35
 Given that Hamilton-Taft is an "authorized representative" for all plaintiffs, the question before this court is whether plaintiffs' claims for indemnity are barred by the "authorized representative" exclusion provision in their respective contracts because of the actions of Armstrong and his cohorts. The district court first stated that it is undisputed that Armstrong himself was not an authorized representative, nor were any of his accomplices. As noted previously, the district court relied on this court's decision in FDIC v. O'Melveny & Meyers, 969 F.2d 744 (9th Cir.1992), rev'd on other grounds, 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), to conclude that Armstrong's malfeasance could not be imputed to Hamilton-Taft since his actions were primarily self-serving and were not intended to benefit Hamilton-Taft. Specifically, the district court held that whether the misconduct of its officers will be attributed to the corporation depends upon who benefitted from the wrongdoing, the corporation or the officers. Accordingly, the district court found that the plaintiffs' claims for indemnity were not barred by the "authorized representative" exclusion given that Armstrong and his accomplices at Hamilton-Taft were not plaintiffs' authorized representatives.
 
 
 36
 We conclude that the equitable doctrines outlined in O'Melveny are inapposite in this case. In O'Melveny, this court was not asked to interpret a contractual term involving the concept of agency or corporate identity, as in this case. Instead, the court had to determine whether the law firm of O'Melveny & Myers could be held liable for malpractice for failure to give proper advice to its client, a bank, when three of its client's officers committed the fraud which O'Melveny should have uncovered. The O'Melveny court found that attorneys are not absolved of their duty to make reasonable, independent investigations to detect or correct false or misleading materials and to give proper advice to a client if officers of the client committed malfeasance. See id. at 750-51. In so ruling, the court referred to general principles of corporate identity and agency law to determine that the wrongful and self-serving acts of the officers could not be imputed to the corporation. See id. at 750.
 
 
 37
 However, this court has limited the application of the O'Melveny ruling. In In re Bartoni-Corsi Produce, Inc., 130 F.3d 857, 862-63 (9th Cir.1997), we declined to extend the policy, recognized in O'Melveny, that a corporation is not bound by those acts of its agents which are detrimental to the corporation, to situations in which a "third-party non-fiduciary is liable to a corporation." In re Bartoni-Corsi, 130 F.3d at 862. In the Bartoni-Corsi case, we concluded that "under California law, a corporation, in dealing with a third party, can be found to have authorized conduct by its agents which is detrimental to the corporation." Id. at 863. In essence, Bartoni-Corsi refused to apply and, thereby, to expand the holding in O'Melveny to situations in which an innocent third-party seeks to impute the acts of a corporation's agents to the corporation itself. In such a situation, we held that the corporation was bound by the acts of its agents. This court follows the Bartoni court's line of reasoning and refuses to expand the O'Melveny agency principles to the instant case where again an innocent third party is involved. Instead, we analyze the issue based on general contract principles.
 
 
 38
 We must determine whether the acts of Hamilton-Taft's officers and employees constitute acts of an "authorized" agent under the exclusion provision of the crime insurance policies issued by Federal Insurance, an innocent third-party insurer. As the First Circuit held in The Stop & Shop Cos., Inc. v. Fed. Ins. Co., 136 F.3d 71 (1st Cir.1998), a case arising from the same fraud and construing the same policy, "[w]e are not concerned here with a determination of whether the corporation Hamilton Taft should be liable to a creditor for the wrongful acts of its employees.... But [plaintiffs'] insurer, Federal, who was not a party to the fraud has no responsibility to reimburse for losses suffered unless those losses are contractually covered." Stop & Shop, 136 F.3d at 76.
 
 
 39
 The court must first look to the plain meaning of the policy language to define the term at issue. As noted previously, the "authorized representative" language must be construed narrowly since it is an exclusion clause. Other courts have struggled to define the term "authorized representative" in the insurance coverage context.[6] In Stop & Shop, the First Circuit analyzed the term "authorized representative" in the context of the same crime insurance policy.[7] The First Circuit began its analysis by looking at the plain meaning of the term; the court used Black's Law Dictionary 133-34 (6th ed.1990) and Webster's Third New International Dictionary (Unabridged) 146 (1966) to craft a definition: "an 'authorized representative' can be either a person or company empowered to act on an entity's behalf." Stop & Shop, 136 F.3d at 74. The First Circuit concluded that acts committed by employees of the "authorized representative" are covered by the exclusion in the crime insurance policy:
 
 
 40
 It is most sensible to consider "authorized representative" as one of a series of capacities in which an individual who commits theft may have been given access to funds by the insured. We see the use of the term as a straightforward effort to embrace all statuses that are "authorized," and thus are the insured's responsibility to supervise. Because Hamilton Taft can act only through its officers, we must construe this exclusion to encompass generally acts by the officers of Hamilton Taft. As officers of the corporate representative, Armstrong and others were given access and power to divert funds.
 
 
 41
 Id. at 76.
 
 
 42
 This court agrees with the First Circuit's ruling that the plain meaning of the "authorized representative" language in the crime insurance policies is not ambiguous and covers those who by authorization of the insured are given access to and permitted to handle the insured's funds. No other interpretation would make sense in terms of the crime insurance policy. The "authorized representative" provision excludes coverage for misappropriation of funds by those individual or entities authorized by the insured to have access to the funds-in essence, those whom the insured empowers to act on its behalf. See id. at 74. In this instance, plaintiffs protected themselves against thefts by employees of Hamilton-Taft by requiring that Hamilton-Taft bond its employees for potential dishonesty, which Hamilton-Taft did for $50 million. The problem in this case is that Armstrong and his cohorts at Hamilton-Taft stole over $95 million.
 
 
 43
 There would be no force or effect to the exclusionary clause if the term "authorized representative" did not include employees and officers of the authorized company. Though a corporation exists sui generis under the law, "it can conduct its affairs only through its officers and employees." Id. at 74. Furthermore, this exclusionary clause would be meaningless if it did not cover criminal acts, such as theft and misappropriation, committed by individual employees or officers for purely selfish reasons. Most crimes committed in the workplace are perpetrated for individual rather than corporate benefit. See id. at 76 n. 6. Hence, a plain reading of the term "authorized representative" in the context of the entire policy lends itself to only one conclusion: acts committed by officers or employees of an authorized representative are encompassed by the "authorized representative" exclusion clause, regardless of their motivations or the net effects.
 
 
 44
 Even though we do not analyze this case under the agency principles applied in O'Melveny, our conclusion is consistent with equitable principles of corporate liability and agency theory under California law. It is true that a corporation is "an entity separate and distinct from its stockholders, with separate and distinct rights and liabilities; and this is true even though a single individual may own all, or nearly all, of the capital stock." In re John Koke Co., 38 F.2d 232, 233 (9th Cir.), cert. denied sub nom., A.R. Demory Inv. Co. v. Haese, 282 U.S. 840, 51 S.Ct. 21, 75 L.Ed. 746 (1930). However, under California law, the following is also true:
 
 
 45
 [T]here is a well-recognized and firmly settled exception to this general rule, that, when necessary to redress fraud, protect the rights of third persons, or prevent a palpable injustice, the law and equity will intervene and cast aside the legal fiction of independent corporate existence, as distinguished from those who hold and own the corporate capital stock, and deal with the corporation and stockholders as identical entities with identical duties and obligations.
 
 
 46
 Wenban Estate, Inc. v. Hewlett et al., 193 Cal. 675, 696, 227 P. 723 (1924). In this case, Armstrong was the sole shareholder and director of Hamilton-Taft who directed the Ponzi scheme of misappropriation of Hamilton-Taft clients' funds. Other officers and employees were involved in this fraud. According to Steven Solodoff, Hamilton-Taft's former controller, approximately half of the employees of Hamilton-Taft knew about the misappropriation. The individuals involved in this scheme used their positions as employees of Hamilton-Taft and the mechanism of the business to divert funds for their own use. See Rutherford v. Rideout Bank, 11 Cal.2d 479, 484, 80 P.2d 978 (1938) (holding that "[l]iability is based upon the fact that the agent's position facilitates the consummation of the fraud."); see also In re Bartoni-Corsi, 130 F.3d at 862 n. 9 (holding that the court may look to the acts of a corporation's directors acting within the scope of their authority to impute responsibility to the corporation). The Supreme Court of California has held the following:
 
 
 47
 [I]t has been held that upon a sufficient showing that a corporation is but the instrumentality through which an individual, who is the sole owner of all of the corporate capital stock, for convenience transacts his business, equity, looking to the substance rather than the form of the relation, and the law as well, will hold such corporation obligated for the acts of the sole owner of the corporation to the same extent and just as he would be bound in the absence of the existence of the corporation.
 
 
 48
 Wenban Estate, 193 Cal. at 696-97, 227 P. 723. Given Armstrong's status as Hamilton-Taft's sole shareholder and director, the use of Hamilton-Taft's resources and operations to conduct his scheme, and the involvement of Hamilton-Taft officers and employees, it is apparent that Hamilton-Taft served merely as an instrumentality through which Armstrong served his own interests by diverting clients' funds. Thus, under California law, Armstrong's actions should be attributed to Hamilton-Taft to avoid the injustice of having Federal pay for the misappropriation of funds by Hamilton-Taft's officers and employees.
 
 
 49
 In sum, we conclude that plaintiffs are precluded from recovering under the premises and transit sections of their crime insurance policies because the "authorized representative" provision excludes coverage for losses caused by the misappropriations by Hamilton-Taft's agents and employees. Consequently, this court need not reach the issue of whether plaintiffs had a duty to disclose the nature of their relationships with Hamilton-Taft to Federal Insurance Company or whether plaintiffs' failure to disclose constitutes a material omission so as to allow Federal to preclude coverage.
 
 
 50
 REVERSED and REMANDED for further proceedings in accordance with this ruling.
 
 
 
 [1]
 The Honorable Judith N. Keep, District Judge, United States District Court for the Southern District of California, sitting by designation
 
 
 [2]
 In its March 8, 1995 order, the district court described Stanford's relationship with Hamilton-Taft as follows: "Stanford did not appoint Hamilton Taft as its representative." The district court did not explain its reasoning for this conclusion given the provisions of the TSA and the IRS Form 2848-D filed by Stanford; the district court did not make reference to the IRS Form 2848-D which authorized Hamilton-Taft to act as its representative before the IRS for payroll tax purposes
 
 
 [3]
 The employee theft coverage provides coverage for direct losses of money, securities, and other property caused by theft or forgery by any identifiable employee(s) of the insured, acting alone or in collusion with others. Under the policy, employee is defined as follows: "... one or more persons while in the regular service of any insured in the ordinary course of the Insured's business during the term of this policy and whom any Insured compensates by salary, wages and/or commissions and has the right to govern and direct in the performance of such service; and shall also mean: ... (C) any director or trustee of any Insured while performing acts coming within the scope of the usual duties of an Employee...." See Verbatim's policy at § 7
 
 
 [4]
 Stanford claims that Hamilton-Taft failed to transmit $3,512,722.32 of its funds to taxing authorities. Verbatim avers that Armstrong misappropriated $390,760.36 of its money. Glendale contends that a total of $625,709.80 was never forwarded to the IRS
 
 
 [5]
 In its Order Denying Defendant's Motion for Reconsideration, the district court ruled that the preference settlement payments paid by Stanford and Glendale to Hamilton-Taft were part of the loss covered by Federal's crime insurance policy. Our decision that coverage was excluded by the "authorized representative" clause necessarily defeats this recovery and makes it unnecessary for us to address Federal's other arguments relating to the preference settlements
 
 
 [6]
 For example, in Colson Servs. Corp. v. Ins. Co. of N. Am., 874 F.Supp. 65, 68 (S.D.N.Y.1994), the district court determined that the term "authorized representative" should be given a broad definition to encompass any entity given the authority to act as one's agent
 
 
 [7]
 The First Circuit issued its decision in Stop & Shop after the district court's decision in this case; therefore, the district court did not have an opportunity to review the First Circuit's ruling before issuing its decisions