# FOR PUBLICATION

ATTORNEYS FOR APPELLANTS:

**GEORGE M. PLEWS**
**F. RONALDS WALKER**
**AMY E. ROMIG**
Plews Shadley Racher & Braun, LLP
Indianapolis, Indiana

**STAN B. HIRSCH**
Indianapolis, Indiana

**ROBERT J. EWBANK**
Ewbank & Kramer
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE:

**E. MICHAEL OOLEY**
**SUZANNE ABRAM**
Boehl Stopher & Graves, LLP
New Albany, Indiana

**EDWARD P. GIBBONS**
**CHRISTOPHER A. WADLEY**
Walker Wilcox Matousek, LLP
Chicago, Illinois

FILED

Dec 05 2013, 9:59 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

WILLIAM KLEPPER, on behalf of himself and )
all others similarly situated, )
                                           )
    Appellants-Plaintiffs/Cross Appellees, )
                                           )
        vs.                                )    No. 15A05-1212-CC-645
                                           )
ACE AMERICAN INSURANCE COMPANY, )
                                           )
    Appellee-Defendant/Cross Appellant.    )

APPEAL FROM THE DEARBORN CIRCUIT COURT
The Honorable Thomas K. Milligan, Judge
Cause No. 15C01-0502-CC-9

**OPINION - FOR PUBLICATION**

**BARNES, Judge**

## Case Summary

William Klepper, on behalf of himself and all others similarly situated ("the Class"), appeals the trial court's order adopting the special master's reports and entering partial final judgment in favor of ACE American Insurance, Inc., ("ACE"). ACE cross-appeals, challenging the special master's resolution of some of the issues and the entry of partial final judgment. This case also involves Pernod Ricard USA, LLC, d/b/a Seagram Lawrenceburg Distillery ("Pernod"), who was insured by ACE and XL Insurance America ("XL"). We affirm.

## Issues

The Class and ACE raise several issues. We address the following dispositive issues:

    I.    whether the special master properly concluded that ACE was not bound by a settlement agreement between the Class, Pernod, and XL because Pernod breached its obligations under the ACE policy; and

    II.    whether ACE is entitled to final judgment on all outstanding claims.

## Facts

Pernod owned and operated a distillery in Lawrenceburg from January 2002 until June 2007. With the exception of a major fire in 1933, the distillery has been operating

since 1847. During the distillation process, ethanol was released into the air, causing mold to grow on the exterior of nearby buildings. Klepper owns property near the distillery that was damaged by the emissions. Pernod was insured by XL from January 1, 2001, to January 1, 2003, and by ACE under a commercial general liability policy ("the Policy") from January 1, 2003, until January 1, 2004.

The Policy included a "legally obligated to pay" provision, which stated that ACE "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." App. p. 394. The Policy also included a "voluntary payment" provision, which stated, "No insured will, except at the insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent." Id. at 404.

In 2005, Klepper brought a class action lawsuit against Pernod on behalf of similarly situated property owners. The second amended complaint alleged nuisance, negligence, trespass, and illegal dumping. The costs of remediation varied from Pernod's estimate of approximately $115,000 to the Class's estimate of $20,500,000.[1]

When Pernod tendered the claim to ACE in March 2005, "ACE mistakenly classified the claim as an underage drinking matter and closed its file." Id. at 663. In October 2007, ACE was advised that it was not an underage drinking claim and that XL had been providing Pernod with a defense. XL sought contribution from ACE for the costs of the defense it had been providing. ACE agreed to contribute 49% of Pernod's defense costs under a full reservation of rights. In a May 2008 letter, Pernod's deputy

---

[1] The Class initially alleged damages at over $100,000,000.

general counsel recognized and acknowledged that ACE was agreeing to provide Pernod with a defense.

ACE reimbursed XL $40,857.44 for its portion of the previously-incurred defense costs. From the time ACE agreed to contribute to the defense until September 21, 2009, ACE paid an additional $44,232.60 to cover its share of the defense. On September 21, 2009, ACE received an email from Pernod's defense counsel explaining that ACE's billing system had unacceptably reduced the approved payment amounts. Defense counsel totaled the amounts owed by ACE for immediate full payment. On September 23, 2009, ACE issued payment for the full amount owed, $58,974.89. On September 25, 2009, ACE received an email from defense counsel's legal assistant thanking it for its "quick response" to the bills sent earlier in the week.[2] Id. at 677. ACE later paid another $23,900.24 for its share of the defense. In total, ACE contributed $167,965.17 toward Pernod's defense.

The dispute was unsuccessfully mediated on August 19, 2008. In January 2009, the trial court granted summary judgment for Pernod on the illegal dumping claim. During settlement discussions, XL and Pernod asked ACE to contribute $1,000,000 toward a settlement agreement, but ACE refused and offered to contribute $250,000.

A second mediation was held on April 14, 2009. ACE attended the meditation but left before it was over. The Class, XL, and Pernod reached a settlement agreement. They agreed that judgment against Pernod would be entered in the amount of $5,200,000.

---

[2] Although the Class asserts in its reply brief that ACE does not recognize the sarcasm in this statement, the Class does not direct us to any factual support indicating that the comment was intended to be sarcastic.

4

Specially, Pernod would contribute $1,200,000 and XL would contribute $1,000,000 to a common fund for the immediate use and benefit of the Class. The remaining $3,000,000 was to be collected from ACE "to the extent the damages fall within the scope of ACE Commercial General Liability Policy . . . ." Id. at 370. The settlement agreement provided that the litigation costs and expenses incurred by the Class "shall be paid from the Common Fund before any distributions to Class Members are made." Id. at 371.

On May 11, 2009, the Class filed a third amended complaint, which included a claim for declaratory judgment regarding coverage under the Policy for the damages sought by the Class. In August 2009, the Class agreed to release Pernod and XL from any claims and to dismiss its claims against Pernod with prejudice upon the receipt of the $2,200,000 payment from Pernod and XL. The release specifically provided:

> Effective upon the Class's and its counsels' receipt of the $2,200,000.00 Payment from Pernod identified in Paragraph C above, the Class for themselves individually and for their respective members, release Pernod . . . and XL . . . from any claims, demands, rights of actions or liabilities, known or unknown, arising from Pernod's acts or omissions during the Claim Period that were asserted or could have been asserted in this cause, except as required to effectuate the settlement. The parties represent and agree that this Release is not intended to, and does not, eliminate or compromise any claims, demands, rights of action or liabilities between and among the Class against [ACE] or any other insurer of Pernod (with the sole exception of XL) which may implicate any insurance policy or any other source of funds from which the Agreed Judgment or any part of it might be paid.

Id. at 775-76.  The Class also agreed that, upon the receipt of the $2,200,000, it would not execute any unsatisfied portion of the agreed judgment against Pernod and XL.[3]  At some point, Pernod assigned its claims to the Class.

In September 2009, after a hearing to determine the fairness of the settlement agreement, the trial court approved it.  The trial court also approved the payment of $733,333.33 in attorney fees and $106,909.87 in expenses incurred by the Class from the common fund.

On December 29, 2010, the Class filed a fourth amended complaint asking the trial court to declare that up to $3,000,000 in damages, attorney fees, and post-judgment interest may be collected from ACE under the Policy.  The Class also made bad faith and unfair claims handling allegations against ACE.

Eventually, the case was assigned to a special master.  In an August 6, 2012 letter to the special master, the parties identified the six issues to be presented to the special master and laid out the agreed upon briefing process, which included the parties simultaneously submitting opening briefs, statements of facts, and exhibits and then simultaneously submitting responses.  On September 27, 2012, in his twenty-seven page report, the special master concluded that the "legally obligated to pay" and "voluntary payment" defenses were available to ACE because ACE provided a defense under a reservation of rights.  The special master concluded, "ACE honored its obligation.  As a matter of law Pernod breached its obligation by entering the agreed judgment without the

---

[3]  The covenant not to execute also specified that it was not intended to eliminate or compromise any claims, demands, rights of action, or liabilities between the Class and ACE.

consent of ACE and the Class, as its assignee, will have to live with the consequences of Pernod's breach." Id. at 44. The special master also resolved the remaining five issues, some favorably to the Class and some favorably to ACE.

The Class filed a motion to correct error, which the special master granted in part as it related to a factual finding that did not affect his ultimate conclusion regarding ACE's liability under the Policy. The special master overruled the Class's second specification of error.

On October 9, 2012, ACE asked the trial court to adopt the special master's report and to enter final judgment in its favor. On December 17, 2012, the trial court entered an order adopting the special master's reports and declining to enter final judgment on all issues. The trial court directed "entry of only the holdings on the six issues referred to the Special Master as a partial final judgment pursuant to Trial Rule 54(B)" and stayed the remaining issues. Id. at 78. The Class and ACE now appeal.

**Analysis**

*I. Settlement Agreement*

The parties agree that they presented questions of law for the special master's resolution. They also agree that the special master's legal conclusions are subject to de novo review. Siwinski v. Town of Ogden Dunes, 949 N.E.2d 825, 828 (Ind. 2011) ("When the issue on appeal is a pure question of law, we review the matter de novo.").[4]

"Insurance policies are contracts that are subject to the same rules of construction as are other contracts." Sheehan Const. Co., Inc. v. Cont'l Cas. Co., 935 N.E.2d 160, 169

---

[4] The parties do not reference Indiana Trial Rule 53, which pertains to special masters.

(Ind. 2010), adhered to as modified on reh'g, 938 N.E.2d 685 (Ind. 2010). "When the language of an insurance contract is clear and unambiguous, we will assign to the language its plain and ordinary meaning." Id. An insurance policy that is unambiguous must be enforced according to its terms, even those terms that limit an insurer's liability, and we may not extend insurance coverage beyond that provided by the unambiguous language in the contract. Id. "Also, insurers have the right to limit their coverage of risks and, therefore, their liability by imposing exceptions, conditions, and exclusions." Id.

ACE relies on the "legally obligated to pay" and "voluntary payment" provisions to assert that it owes no coverage under the Policy. The first provides that ACE "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." App. p. 394. ACE argues that because, pursuant to the settlement agreement Pernod was released of liability, Pernod was not legally obligated to pay the $3,000,000 to the Class and, therefore, ACE cannot be liable to pay the unpaid balance either. See U. S. Fire Ins. Co. v. Lay, 577 F.2d 421, 423 (7th Cir. 1978) (holding that, where settlement agreement released primary insurer of all liability in excess of $70,000, the obligation of the excess carrier to indemnify the primary insurer never arose because the primary insurer "was not and could not be liable for any amount in excess of $100,000 . . . .").

The second provision is part of the "Duties In The Event Of Occurrence, Offense, Claim or Suit" section of the Policy and provides, "No insured will, except at the insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent." App. pp. 403, 404. ACE argues

8

that, because Pernod settled the Class's claims without ACE's consent, the "voluntary payment" provision precludes coverage. ACE relies on the reasoning in American Family Mutual Insurance Co. v. C.M.A. Mortgage, Inc., 682 F. Supp. 2d 879, 881 (S.D. Ind. 2010).

On the other hand, the Class contends that, although other coverage defenses apply, ACE "may not (1) use the settlement as a tool to avoid coverage by the 'consent' or 'legally obligated to pay' defenses, or (2) challenge Pernod's liability on the damages fixed in the settlement." Appellant's Br. p. 25. The Class frames the issue as how should courts balance "(1) the need of a policyholder to protect itself where its insurer refuses to commit to indemnity and leaves it facing a large potential liability; and (2) the right of an insurer to protect itself against collusive or unreasonable settlement if it turns out to have indemnity coverage obligations?" Appellant's Reply Br. p. 11. The Class argues that this is not a question of applying the various terms of the policy, "but a fair balancing of the competing interests." Id. at 12. In support of its argument, the Class relies on Midwestern Indemnity Co. v. Laikin, 119 F. Supp. 2d 831, 833 (S.D. Ind. 2000), and Cincinnati Insurance Co v. Young, 852 N.E.2d 8 (Ind. Ct. App. 2006), trans. denied.

### A. Review of Relevant Cases

#### 1. Laikin

The Laikin court addressed whether an insurer, Midwestern, was bound by a consent judgment entered into by the insured, Laikin, and tort victims injured in a fire. Notably, all of the pleadings were premised on the assumption that Midwestern breached

the contract by refusing to provide a defense and indemnity for the losses arising from the fire. Laikin, 119 F. Supp. 2d at 835. In its analysis, the Laikin court acknowledged:

> An insurer is normally treated as being in privity with its insured for purposes of collateral estoppel or issue preclusion. "The doctrine of collateral estoppel applies to insurance contracts and an insurer is ordinarily bound by the result of litigation to which its insured is a party, so long as the insurer had notice and the opportunity to control the proceedings."

Id. at 836 (quoting Liberty Mut. Ins. Co. v. Metzler, 586 N.E.2d 897, 900 (Ind. Ct. App. 1992), trans. denied). Laikin observed that collateral estoppel may not apply to issues affecting coverage where an insurer either defends the insured under a reservation of rights or files a declaratory judgment action. Id. (citing Metzler, 586 N.E.2d at 901); see also Frankenmuth Mutual Ins. Co v. Williams, 690 N.E.2d 675, 679 (Ind. 1997) (citing Metlzer for the proposition that an insurer may refuse to defend or refuse to clarify its obligation by means of a declaratory judgment action but does so at its peril). Laikin considered Metzler, Frankenmuth, and State Farm Mutual Auto Insurance Co. v. Glasgow, 478 N.E.2d 918, 923 (Ind. Ct. App. 1985), as implying:

> an insurer who files a declaratory judgment action may retain the ability to litigate those issues that affect its coverage. None of those cases suggests, however, that filing a declaratory judgment action leaves the insurer free to litigate (or relitigate) the issues of its insured's liability or the amount of damages.

Laikin, 119 F. Supp. 2d at 837.

10

The Laikin court concluded that these cases were generally consistent with the Restatement (Second) of Judgments and decisions by the Supreme Court of Minnesota and the Supreme Court of Arizona.[5] Laikin summarized those courts as holding:

> that where an insurer has defended under a reservation of rights or has filed a declaratory judgment action, a consent judgment between an insured and a tort plaintiff will bind the insurer as to issues not related to coverage, at least so long as the insured has acted reasonably and in good faith.

Id. at 838. The Laikin court predicted that:

> Indiana courts would adopt an approach to this case in which the consent judgment with a covenant not to execute would bind the insurer on issues of its insured's liability and the extent of the injured parties' damages, so long as (1) the coverage is eventually shown, and so long as the consent judgment (2) is not the product of bad faith or collusion and (3) falls somewhere within a broad range of reasonable resolutions of the underlying dispute.

Id. at 842. The court declined to predict precisely which approach Indiana would take regarding the burdens of production and proof on the issues of bad faith, collusion, and reasonableness because it found as a matter of law that the terms of the consent judgment were not unreasonable and could not reasonably permit an inference of collusion or bad faith. Id. at 850.

The Laikin court also addressed Midwestern's "legally obligated to pay" defense, which was based on policy language that Midwestern would "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Id. at 851. Midwestern asserted that

---

[5] See Miller v. Shugart, 316 N.W.2d 729 (Minn. 1982); United Servs. Auto. Ass'n v. Morris, 154 Ariz. 113, 119, 741 P.2d 246, 252 (1987).

11

it had no duty to pay the consent judgment because the agreement did not impose any legal obligation on the insured to satisfy the $1,600,000 judgment.

In rejecting this argument, the Laikin court relied on our decision in American Family Mutual Insurance Co. v. Kivela, 408 N.E.2d 805 (Ind. Ct. App. 1980). In Kivela, we addressed a similar argument after an insurer refused to assume "any responsibility" under the insurance contract. Kivela, 408 N.E.2d at 806. We held that "an insurer may not hide behind the 'legally obligated to pay' language of the policy after it abandons its insured and the insured settles the claim against him by agreement . . . ." Id. at 813.

The Laikin court did not believe our supreme court would treat a coverage lawsuit as a reason to distinguish Kivela because that "would, in effect, enable an insurer, by breaching its contract, to lock its insured and injured victims into years of expensive and unwanted litigation." Laikin, 119 F. Supp. 2d at 852. The Laikin court reasoned:

> Under Midwestern's approach, an insured who has been forced by his insurer to pay for his own defense and to face huge personal liability would be in a no-win, or perhaps a "no-settlement," situation. If the covenant not to execute lets the insurer off the hook completely, the insured and the injured parties would not be able to allocate between themselves the risks created by uncertainty over insurance coverage. The injured parties would have no incentive to settle their tort claims until after the coverage issue was resolved, perhaps years later.

Id. at 854 (emphasis added). The court concluded that Midwestern was "precluded from relying on the 'legally obligated to pay' language in the insurance policy." Id.

### 2. *Young*

12

In Young, Tri-Etch was insured by Scottsdale and Cincinnati under three separate polices. When Tri-Etch was sued by the estate of an injured party, Scottsdale elected to defend Tri-Etch while Cincinnati denied coverage and filed a declaratory judgment action in federal court. Eventually, Tri-Etch and the estate reached a settlement agreement, in which Scottsdale agreed, among other things, to pay the estate $1,000,000 on behalf of Tri-Etch in exchange for a release of any further claims, and the estate agreed not execute the remainder of the judgment against any of Tri-Etch's assets except the coverage under the Cincinnati policy. Cincinnati moved to intervene for the purpose of appealing in its own name only and reaffirmed that it would not provide coverage, and the trial court permitted Cincinnati to intervene.

On appeal, the estate challenged Cincinnati's intervention. In deciding the trial court abused its discretion by allowing Cincinnati to intervene, we adopted Laikin as it relates to an insurer's ability to relitigate an insured's liability and damages where an a declaratory judgment action has been filed on the issue of coverage. Young, 852 N.E.2d at 14. We concluded, "because Cincinnati contested its coverage at the same time it filed its motion to intervene, its interest in the subject matter for purpose of Indiana Trial Rule 24(A)(2) was contingent and not direct." Id. at 15.

We found "that the manner in which the lawsuit between Tri-Etch, Scottsdale, and the Estate was resolved does not affect our preceding analysis." Id. at 16. We reasoned:

> If, as here, the insureds are offered a settlement that effectively relieves them of any personal liability, at a time when their insurance coverage is in doubt, surely it cannot be said that it is not in their best interest to accept the offer. Nor, do we think, can the insurer who is disputing coverage

13

> compel the insureds to forego a settlement which is in their best interest. See [Laikin], 119 F. Supp. 2d at 839. However, we do recognize that there is a risk that the resulting settlement was not the product of reasonableness or good faith. Nevertheless, the proper place to raise these purported issues of reasonableness and good faith is during an action to determine whether the claim is covered by the policy or during an action to enforce the judgment.

Id. at 16-17.

### 3. *CMA*

In CMA, CMA was sued for purported violations of the Fair Credit Reporting Act. CMA sought a defense and coverage from its insurer, American Family, who denied coverage but provided CMA with a defense under a reservation of rights and filed a declaratory judgment action. When settlement negotiations began, American Family informed CMA that it would regard any settlement to be a violation of CMA's obligation under the provisions of the policies that prohibited an insured from making a voluntary payment, assuming any obligation, or incurring any costs without the insurer's consent. Nevertheless, CMA agreed to allow a stipulated judgment to be entered against it in the amount of $2,990,000 with the express proviso that the judgment could only be satisfied by the insurance proceeds of the American Family policies.

In determining the effect of the unconsented-to settlement on American Family's obligation to indemnify, the court began its analysis with Glasgow, Metzler, Frankenmuth, Laikin, and Young. CMA also considered Morris v. Economy Fire & Casualty Co., 848 N.E.2d 663, 666-67 (Ind. 2006), in which our supreme court ruled that an insurance contract did not allow an insured to impose a prerequisite upon the insurer

14

before complying with agreed duties. The Morris court concluded that the Morrises breached the insurance contract as a matter of law when they refused to provide an examination under oath, as the policy required, until the insurer fulfilled additional conditions prescribed by the Morrises. Morris, 848 N.E.2d at 666-67. CMA also considered State Farm Fire & Casualty Co. v. T.B., 762 N.E.2d 1227, 1231 (Ind. 2002), in which our supreme court, relying on Metzler and Glasgow, observed:

> An insurer may avoid the effects of collateral estoppel by: (1) defending the insured under a reservation of rights in the underlying tort action, or (2) filing a declaratory judgment action for a judicial determination of its obligations under the policy. Either of these actions will preserve an insurer's right to later challenge a determination made in the prior action.

T.B., 762 N.E.2d at 1231 (citation omitted).

The CMA court determined that Young did not apply and concluded that our supreme court "would not permit an insured unfettered discretion to enter into a settlement that would bind the insurer without securing the prior consent of the insurer." CMA, 682 F. Supp. 2d at 886. CMA held, "American Family is not bound by the settlement agreement and consent decree entered into by CMA . . . , nor is American Family estopped or otherwise precluded from challenging CMA's liability or the amount of any damages payable to Plaintiffs . . . ." Id. at 890.

CMA explained that American's Family's position for denying coverage created a conflict of interest requiring it to reimburse the insured's independent counsel as part of its duty to defend, which it did. Id. at 890-91. Further, by providing a defense and seeking declaratory judgment, American Family "doubled down" on its obligation to act

15

in good faith, "protecting American Family against any collateral exposure on the issue of coverage it might otherwise have faced from a judgment . . . ." Id. at 891. CMA observed that "American Family had the right to reserve its defenses to coverage while providing CMA with a defense and not be found in breach of its contractual obligations in its policies." Id. The court concluded, "[t]he policy language unambiguously forecloses CMA's freedom to enter into such a settlement, and American Family's actions neither breached the contract or relieved CMA of its own contractual obligations." Id.

CMA restated the following criticism of the out-of-state cases Laikin relied on: "'the reasoning of these cases is flawed because they permit an insured to breach his duties under the policy without losing coverage, even though there has not been a breach of the contract by the insurance company. Therefore, we decline to follow them.'" Id. at 892 (quoting Kelly v. Iowa Mutual Ins. Co., 620 N.W.2d 637, 642 (Iowa 2000)). The CMA court went on to distinguish Laikin in part because of the premise in Laikin that a judgment would be viewed from the standpoint of the insured at the time of the agreement because the insurer breached its contract and left the insured hanging. The CMA court stated:

> [t]o the extent that Judge Hamilton's conclusion reflects the fact that the insurer did not cover the costs of the underlying defense, we have no quarrel; but if his conclusion is based on the assumption that the insurer's providing a defense while also seeking a declaratory judgment would be a breach of contract, we respectfully disagree, as does the [Indiana] Supreme Court, as we understand its rulings.

Id. at 893.

16

CMA also observed that <u>Laikin</u> was decided before our supreme court issued <u>T.B</u>, <u>Morris</u>, and <u>Dreaded, Inc. v. St. Paul Guardian Insurance</u>, 904 N.E.2d 1267 (Ind. 2009), in which our supreme court "reiterated its view first explicated in <u>Morris</u>, that prejudice need not be shown when an insurer seeks to enforce policy provisions that are threshold requirements, such as the obligation to give notice, supply records and documentation and submit to an examination under oath." <u>Id.</u> (citing <u>Dreaded</u>, 904 N.E.2d at 1271-72). <u>CMA</u> speculated that, had Judge Hamilton had the benefit of these decisions, he might have reached a different conclusion. <u>Id.</u>

According to <u>CMA</u>, because CMA assumed the obligations of the consent judgment in violation of the insurance contract, American Family was "relieved of any obligation to pay or satisfy, in whole or in part, the judgment entered against CMA . . . or to satisfy any settlement between CMA and Wanek entered into without American Family's consent." <u>Id.</u> at 894.

### *B. Resolution*

In determining whether to follow the rationale of <u>Laikin</u> or <u>CMA</u>, we begin with the fact that <u>Laikin</u> was premised on the assumption that the insurer had breached the insurance contract. <u>See</u> <u>Laikin</u>, 119 F. Supp. 2d at 835. The insurer's breach and abandonment of the insured was clearly significant to the <u>Laikin</u> court's analysis of whether an insurer is collaterally estopped from relitigating the issues of liability and damages.[6] Unlike in <u>Laikin</u>, there is no presumption here that ACE breached the

---

[6] For example, in determining how Indiana courts would approach this type of case, the <u>Laikin</u> court described "an insurer who has breached its contract," "the abandoned insured" who "is likely to be stuck

17

insurance contract. Rather, the parties vehemently dispute whether ACE breached the insurance contract by abandoning Pernod.

We also take issue with the Class's assertion that <u>Laikin</u> "establishes that an insurer, even one which has defended under a reservation of rights or filed declaratory judgment action, is bound by a reasonable, non-collusive settlement." Appellant's Br. p. 18. This assessment ignores the requirement that, for a settlement agreement to be binding on an insurer, coverage must be shown. <u>Id.</u> at 838, 842. Thus, even under <u>Laikin</u>, a determination of coverage is required in order for an insurer to be bound by a settlement agreement's assessment of liability and damages.

As we see it, the resolution of the coverage question includes the consideration of ACE's and Pernod's rights, obligations, and breaches under the terms of the Policy. We believe that such an approach is in keeping with our supreme court's decisions in <u>T.B.</u>, which explains that an insurer can preserve its rights by defending the insured under a reservation of rights, and <u>Morris</u>, which concluded that the insureds breached their policy by refusing to comply with the policy conditions. This approach is also consistent with the longstanding principle that "[a] party first guilty of a material breach of contract may not maintain an action against the other party or seek to enforce the contract against the other party should that party subsequently breach the contract." <u>Illiana Surgery & Med. Ctr., LLC. v. STG Funding, Inc.</u>, 824 N.E.2d 388, 403 (Ind. Ct. App. 2005).

---

for years in expensive litigation as a result of the insurer's breach of the insurance contract[,]" and "Indiana courts' recognition of the needs of the insured and injured plaintiffs when the insured has been abandoned by its insurer." <u>Laikin</u>, 119 F. Supp. 2d at 842. The court stated, "A more direct approach to that issue would suffice to protect the breaching insurer from outrageous efforts to overreach, while still encouraging and allowing settlement of disputes between the abandoned insured and injured plaintiffs." <u>Id.</u>

Accordingly, we begin with ACE's duty to defend. The Class contends that ACE abandoned Pernod, at least in part, by not negotiating a settlement in good faith and not providing a defense.[7] We disagree. As for the settlement negotiations, during the 2009 negotiations, Pernod and XL offered to contribute $1,000,000 each and urged ACE to contribute $1,000,000 toward a $3,000,000 settlement offer. ACE refused, agreeing only to contribute only $250,000. ACE took the position that its indemnity obligations were limited in large part by the $10,000 per claim deductible.[8] ACE also relied on the ongoing nature of the emissions compared to its limited coverage only from January 2003 to January 2004. Finally, ACE did not believe that there had been an "occurrence" as defined by the Policy. Without more, we are not convinced ACE's refusal to contribute more toward the settlement agreement constituted abandonment.

As for the defense, the Class focuses on ACE's initial wrongful closing of the case and defense counsel's difficulty getting paid by ACE. The Class asserts that Pernod was prejudiced by ACE's conduct because it could not confidently rely on ACE to provide a defense. Although ACE did initially wrongfully close the case and failed to make timely payments to defense counsel, as ACE also points out, Pernod was always represented by counsel even if XL was initially paying for it and, at the end of the day, ACE ultimately contributed $167,965.17 toward Pernod's defense. Under these circumstances, we are

---

[7] The Class focuses on abandonment and only refers to ACE breaching the insurance contract at the end of the discussion of this issue in its reply brief. See Appellant's Reply Br. p. 24 ("ACE was in breach of its duty to defend since it had not paid the bills despite reminders.").

[8] There is no evidence that the XL policy contained the same $10,000 deductible.

19

not convinced that ACE breached the terms of the Policy or otherwise relieved Pernod of its obligations under the Policy by abandoning Pernod.

Accordingly, ACE may rely on the Policy's "voluntary payment" and "legally obligated to pay" provisions, and those provisions preclude coverage under the Policy.[9] To hold otherwise, would, effectively require us to write the "voluntary payment" and "legally obligated to pay" provisions out of the Policy, which we cannot do. See Keckler v. Meridian Sec. Ins. Co., 967 N.E.2d 18, 28 (Ind. Ct. App. 2012) ("The power to interpret insurance policies does not extend to changing their terms."), trans. denied. We recognize and understand the dissent's concerns. We simply believe that the rationale in CMA, the fact that ACE did not abandon Pernod or breach the Policy, and the extended analysis we have provided guide us to this result.

## II. Entry of Final Judgment

ACE argues that, if we affirm the ruling that no coverage is owed, "it necessarily disposes of all of Klepper's claims." Appellee's Br. p. 55. Accordingly, ACE requests that we remand for the entry of final judgment in its favor on all claims. In response, the Class contends that multiple claims still exist, including whether ACE is liable to Pernod

---

[9] The "voluntary payment" provision unambiguously foreclosed Pernod's freedom to enter into the settlement agreement, and doing so relieved ACE of any obligation to pay or satisfy the unpaid portion of the settlement agreement. See CMA, 682 F. Supp. 2d at 891, 894; see also Travelers Ins. Companies v. Maplehurst Farms, Inc., 953 N.E.2d 1153, 1161 (Ind. Ct. App. 2011) ("[I]t is apparent that where an insured enters into a settlement agreement without the insurer's consent in violation of a voluntary payment provision, that obligation cannot be recovered from the insurer, and prejudice is irrelevant."), trans. denied. Further, as we have already determined, ACE did not abandon Pernod. Thus, the rationale in Laikin and Kivela for prohibiting an insurer from relying on a "legally obligated to pay" provision does not apply here.

20

for any of the $1,200,000 that Pernod paid to settle case and whether its bad faith claim is actionable even if there is no coverage.[10]

As for the recovery of the $1,200,000 that Pernod contributed toward the settlement, the Class refers to language from its fourth amended complaint to suggest that it:

> sought redress for all claims or cases of action that: "exist or may exist relating to or arising from [ACE's] handling and adjustment of the insurance claim Pernod submitted to ACE for defense and indemnity . . . including but not limited to claims for bad faith and for the assertion of unreasonable and unfounded defenses to Pernod's coverage claim."

Appellant's Reply Br. p. 48.

Although the complaint does contain that language, it is in an introductory paragraph quoting the assignment of claims from Pernod to the Class. In Count I, labeled "Insurance Coverage," the Class asks the trial court to declare that, "once applicable deductibles are met, up to $3 million in damages awarded against Pernod and in favor of the [sic] Klepper and the other Class Members, plus the attorney fees award to the Class and postjudgment interest, may be collected from ACE under the Policy's terms." App. p. 811. The complaint does not specifically reference the recovery of the $1,200,000 payment by Pernod. Further, given our conclusion that the "voluntary payment" and "legally obligated to pay" provisions preclude coverage under the Policy, it is not clear

---

[10] In describing the multiple claims that still exist, the Class also contends, "when the Special Master found the policy defenses of 'legally obligated to pay' and 'consent' are available to ACE and that ACE is not therefore bound by the settlement between the Class and Pernod, it is not clear that the holding defeats all claims by the Class." Appellant's Reply Br. p. 49. It is not clear, however, what legal theory the Class is asserting as an additional basis for recovering against ACE. Without more, we decline to further address this assertion.

21

what legal basis would support the recovery of the $1,200,000 payment by Pernod. Accordingly, the Class failed to establish that the recovery of the $1,200,000 paid by Pernod is recoverable from ACE.

As for the bad faith claim, the Class asserts that, regardless of coverage, an insurer may breach the covenant of good faith in other ways than the wrongful denial of coverage, including, for example, its handling of the claim. See HemoCleanse, Inc. v. Philadelphia Indem. Ins. Co., 831 N.E.2d 259, 264 n.2 (Ind. Ct. App. 2005) (noting that "an insurer may exhibit bad faith in, for example, its handling of the claim such that even if it engages in a good faith dispute over coverage it may still breach the covenant of good faith and fair dealing."), trans. denied. Indeed, in Monroe Guar. Ins. Co. v. Magwerks Corp., 829 N.E.2d 968, 976 (Ind. 2005), our supreme court reaffirmed "that a good faith dispute concerning insurance coverage cannot provide the basis for a claim in tort that the insurer breached its duty to deal in good faith with its insured" and reiterated that "an insurer's duty to deal in good faith with its insured encompasses more than a bad faith coverage claim." The court acknowledged:

> "The obligation of good faith and fair dealing with respect to the discharge of the insurer's contractual obligation includes the obligation to refrain from (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of his claim."

Magwerks, 829 N.E.2d at 976 (quoting Erie Ins. Co v. Hickman, 622 N.E.2d 515, 519 (Ind. 1993)).

22

In Magwerks, the insured's bad faith claim was based on the insurer's "manner of handling the claim." Id. (internal quotation omitted). However, because neither party provided guidance on the issue, the Magwerks court declined to expand the extent of an insurer's duty beyond that expressed in Hickman.[11] Id.

The court then determined whether, apart from the insurer's denial of the insured's claim based on a good faith dispute over coverage, the insurer's conduct leading up to and including the issuance of the denial letter rose to the level of bad faith. The court concluded that, because before the insured filed its complaint the insurer essentially acknowledged that a collapse had occurred, which was arguably a covered loss, there was evidence to support the jury's conclusion that the insurer's conduct "amounted to 'an unfounded refusal to pay policy proceeds.'" Id. at 977 (quoting Hickman, 622 N.E.2d at 519). Magwerks ultimately held "that a good faith dispute concerning insurance coverage does not automatically preclude a punitive damages claim for bad faith when coverage is denied." Id. at 978.

This holding is consistent with the notion that "an insured who believes that an insurance claim has been wrongly denied may have available two distinct legal theories, one in contract and one in tort, each with separate, although often overlapping, elements, defenses and recoveries." Hickman, 622 N.E.2d at 520. Given the two distinct theories upon which the Class seeks to recover and their separate elements and defenses, we cannot conclude at this stage of the proceedings that the resolution of the contract dispute

---

[11] Likewise, on appeal, the Class has not developed an argument for expanding the scope of an insurer's duty to deal in good faith beyond that described in Hickman and argues only that outstanding discovery that was never completed.

23

necessarily disposes of the tort-based bad faith claim.  Thus, the entry of final judgment on the Class's bad faith claim would be premature.

## Conclusion

Because the "voluntary payment" and "legally obligated to pay" provisions preclude coverage, the trial court properly entered partial judgment in favor of ACE on this issue.  Regarding the entry of final judgment on all claims, because of the distinct legal theories at play, the entry of final judgment in favor of ACE on the Class's bad faith claim would be premature at the this stage of the proceedings.  We affirm.

Affirmed.

PYLE, J., concurs.

CRONE, J., concurs in part and dissents in part.

# IN THE
# COURT OF APPEALS OF INDIANA



WILLIAM KLEPPER, on behalf of himself and all others similarly situated,

    Appellants-Plaintiffs/Cross Appellees,

vs.

ACE AMERICAN INSURANCE COMPANY,

    Appellee-Defendant/Cross Appellant.

No. 15A05-1212-CC-645

**CRONE, Judge, concurring in part and dissenting in part**

I agree with the majority's determination that ACE did not abandon Pernod or breach the Policy. I also agree that entry of final judgment on the Class's bad-faith claim would be premature. I respectfully disagree, however, with the majority's determination that ACE may avoid the settlement agreement based on the Policy's "voluntary payment" and "legally obligated to pay" provisions. An insurer who defends an insured under a reservation of rights should not be able to use those policy provisions as both a shield and a sword.

Most relationships between insurers and insureds involve a substantial imbalance in sophistication, financial resources, and settlement leverage. Consequently, few

25

insureds are in a position to effectuate a settlement without contribution from their insurer. When an insurer reserves its rights under a policy, it takes a position adversarial to its insured. Although the insurer may be funding the defense, the insured still faces the very real possibility of economic ruin. As such, the insured has every incentive to minimize its exposure, and unilaterally negotiating a settlement involving policy proceeds and a release and/or a covenant not to execute may be the least expensive and most expeditious means of doing so.[12] If that settlement is reasonable and in good faith, then the insurer will probably end up no worse off than if it had gone to trial and perhaps much better off than if it had refused to defend and risked a bad-faith claim from its insured. And when all is said and done, the insurer can still dispute reasonableness, collusiveness, and coverage. To hold otherwise would simply allow the insurer to avoid the coverage that was contracted and paid for.

Courts should not reward insurers for putting their insureds in a perilous position, nor should they penalize insureds for trying to protect themselves. For that reason, I believe that ACE should not be able to avoid Pernod's settlement agreement based on the "voluntary payment" and "legally obligated to pay" provisions of the Policy. I express no opinion on the issues not addressed by the majority.

---

[12] It bears mentioning that Pernod, like the insured in *Laikin*, paid a significant portion of the agreed judgment and therefore had "skin in the game," as the *CMA* court called it. 682 F. Supp. 2d at 893.

26