In the

# United States Court of Appeals

### For the Seventh Circuit

———————————

No. 16-1205

TELAMON CORPORATION,

*Plaintiff-Appellant,*

*v.*

CHARTER OAK FIRE INSURANCE COMPANY and
ST. PAUL FIRE AND MARINE INSURANCE COMPANY,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:15-cv-01446-RLY-DML
**Richard L. Young**, *Judge.*

———————————

No. 16-1815

TELAMON CORPORATION,

*Plaintiff-Appellant,*

*v.*

CHARTER OAK FIRE INSURANCE COMPANY AND
TRAVELERS CASUALTY & SURETY COMPANY OF AMERICA,

*Defendants-Appellees.*

————————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:13-cv-00382-RLY-DML
**Richard L. Young**, *Judge*.

————————————

ARGUED SEPTEMBER 29, 2016 — DECIDED MARCH 9, 2017

————————————

Before WOOD, *Chief Judge*, and RIPPLE and WILLIAMS, *Circuit Judges*.

WOOD, *Chief Judge*. Underlying this insurance dispute is a regrettably common tale of greed and dishonesty. Telamon, an Indiana telecommunications firm, engaged Juanita Berry to work for it from 2005 to 2011 as its Vice President of Major Accounts. Berry used that position to steal over $5 million from the firm. Upon discovering this loss, Telamon then turned to two insurance policies in an effort to recover its money: a crime insurance policy with Travelers Casualty & Surety (Travelers), and a commercial property policy with Charter Oak Fire Insurance (Charter Oak). At that point, Telamon crashed into a brick wall. Travelers denied coverage because Berry was *not*, legally speaking, an employee. And Charter Oak refused to pay because, in practice, she *was*.

Telamon cried foul and filed a lawsuit in which it argued that Berry's actions were covered under both policies and that the insurers had breached their duty of good faith. At the eleventh hour, it tried to add St. Paul Fire and Marine Insurance (St. Paul) as a defendant. The court rejected the amendment, at which point Telamon filed a new action against St. Paul and

Charter Oak. That case promptly found its way back to the same court and was dismissed as an impermissible effort to split the claim. Telamon appealed (case 16-1205). Later the court granted summary judgment in favor of the defendants in the original case. Again, Telamon appealed (case 16-1815). We consolidated the appeals for disposition. Finding no error in either of the district court's decisions, we affirm.

## I

We refer to the original suit against Charter Oak and Travelers as *Telamon I*, and the suit against Charter Oak and St. Paul as *Telamon II*. The critical background facts are the same for both cases.

Berry worked for Telamon from 2005 to 2011. Her employment was governed by a series of Consulting Services Agreements (Agreements) between Telamon and J. Starr Communications, Berry's one-woman company through which she provided her services. The terms of the Agreements remained largely unchanged during Berry's six-year association with Telamon. Her role, however, did not. Berry's responsibilities expanded well beyond those described in the Agreements, and she eventually became Telamon's Vice President of Major Accounts, making her the company's senior manager in the New York and New Jersey region. In this capacity she oversaw Telamon's AT&T Asset Recovery Program, which was supposed to remove old telecommunications equipment from AT&T sites and sell it to salvagers. Berry removed the equipment and sold it, but she pocketed the profits. By the time the company realized something was amiss in 2011, it had suffered $5.2 million in losses. Telamon fired Berry and she was later convicted in the District of New Jersey on federal charges of wire fraud and tax evasion; she was sentenced to 60

months' imprisonment and was assessed $3,440,885 in restitution payable to Telamon.

Berry's misdeeds left Telamon with the problem of recouping its losses. Undoubtedly dubious that it would ever see much of the required restitution, it turned to two insurance policies for that purpose: its crime insurance policy with Travelers and its general commercial insurance policy with Charter Oak. These two insurers are subsidiaries of a larger Travelers entity, and so Telamon asked them to work together to avoid duplicative claims investigations. They obliged, but in late 2012 they each gave Telamon the disappointing news that they were denying coverage. Telamon fought back by filing *Telamon I*, which started out in Indiana state court and landed in the federal court via removal. Telamon asserted that its loss was covered under both policies and that the insurers had acted in bad faith (a tort under Indiana law). The district court granted summary judgment for the insurers on the coverage issues in December of 2015, and dismissed the remaining bad faith claims the following April.

Meanwhile, in June 2014, Telamon sought permission to amend its complaint in *Telamon I* to add another set of claims based on older policies issued by St. Paul and Charter Oak. Because this request came almost a year after the deadline for amending pleadings had expired, the court said no. At that point, Telamon filed *Telamon II* in Indiana state court, raising essentially the same claims. The insurers again removed, and in January 2016, the district court dismissed the suit as an impermissible attempt to split claims.

## II

As these cases rest on diversity jurisdiction, we resolve Telamon's claims under Indiana law. See *Native Am. Arts, Inc. v. Hartford Cas. Ins. Co.*, 435 F.3d 729, 731 (7th Cir. 2006). Indiana courts interpret insurance policies under "the same rules of construction as other contracts," taking "the perspective of an ordinary policyholder of average intelligence." *Bradshaw v. Chandler*, 916 N.E.2d 163, 166 (Ind. 2009). An insured has the burden of proving the existence of coverage, while the insurer must show that an exclusion applies. *Nat'l Fire & Cas. Co. v. W. By & Through Norris*, 107 F.3d 531, 535 (7th Cir. 1997); *Home Fed. Sav. Bank v. Ticor Title Ins. Co.*, 695 F.3d 725, 732 (7th Cir. 2012).

The analysis of an insurance policy proceeds in two steps. First, the court examines whether the terms of a policy are unambiguous. If they are, then the court adopts the ordinary meaning of the words. *Beam v. Wausau Ins. Co.*, 765 N.E.2d 524, 528 (Ind. 2002); *Allgood v. Meridian Sec. Ins. Co.*, 836 N.E.2d 243, 246–47 (Ind. 2005) (referring to the dictionary). If there is ambiguity, the court advances to the second step, where it construes any ambiguity strictly against the insurer and in favor of coverage. *Bradshaw*, 916 N.E.2d at 166. A policy is ambiguous if "reasonable people would differ as to its meaning." *Justice v. Am. Family Mut. Ins. Co.*, 4 N.E.3d 1171, 1176 (Ind. 2014).

### A

The Travelers policy at issue covers theft by "an Employee." It defines "an Employee" to include "any natural person … who is leased to the Insured under a written agreement between the Insured and a labor leasing firm, while that person is subject to the Insured's direction and control and

performing services for the Insured." Berry is a natural person, and there was a written agreement between Telamon and J. Starr. To prevail, Telamon must show both that J. Starr was a "labor leasing firm" and that Berry was "subject to [Telamon's] direction and control." Failure to prove either of these is enough to defeat its claim.

Telamon argues that the plain meaning of a "labor leasing firm" is a company "in the business of placing its employees at client companies for varying lengths of time in exchange for a fee." *Pac. Emp'rs Ins. Co. v. Wausau Bus. Ins. Co.*, 2007 WL 2900452, at *8 (M.D. Fla. Oct. 15, 2007); see also *Scottsdale Ins. Co. v. Torres*, 561 F.3d 74, 76, 78 (1st Cir. 2009) (adopting a similar interpretation). In other words, a "labor leasing firm" is a business concern that sells another person's work for a specified time and for a specified fee.

We will accept that definition for purposes of this opinion. Yet even so, we cannot conclude that J. Starr meets it. It is true that the Agreements were contracts between Telamon and J. Starr under which the former obtained the right to Berry's labor. But J. Starr was not a firm in the business of leasing labor; it was just Berry's vehicle for providing her own services. To classify her corporate alter ego as a "labor leasing firm" would be to elevate form over substance. The cases Telamon cites to support its position underscore our point. The "labor leasing firm" in *Pacific Employers* had multiple branches and specialized "in providing industrial clients with daily workers." 2007 WL 2900452, at *1–2. Similarly, the firm in *Torres* "hire[d] individuals and place[d] them with client companies for varying lengths of time," including at least six with the company litigating its insurance coverage. 561 F.3d at 75–76. There is no way to squeeze J. Starr into the same box. Berry's company

was a legal convenience, and nothing more. Because it was not a "labor leasing firm," she was not an "Employee" for purposes of the Travelers policy.

B

Telamon also claims that Berry's theft is covered by its Charter Oak commercial property policy. That policy covers risks of direct physical loss, unless one of its exclusions applies. We can assume that Telamon suffered a loss covered by the policy. We thus turn to the exclusions, and in particular to the exclusion for any "[d]ishonest or criminal act by … employees (including leased employees), directors, trustees, *authorized representatives* or *anyone* (other than a carrier for hire or bailee) *to whom you entrust the property for any purpose*." (Emphasis added.) The parties agree that Berry committed a "dishonest or criminal act." What they dispute is whether she falls into one of the specified personnel categories. If so, the exclusion applies, and coverage was properly denied.

We consider first whether Berry was an "authorized representative" of Telamon. Courts that have looked at this term in other cases dealing with the same policy language have concluded that it is unambiguous. See *Stop & Shop Cos., Inc. v. Fed. Ins. Co.*, 136 F.3d 71, 75–76 (1st Cir. 1998); *Stanford Univ. Hosp. v. Fed. Ins. Co.*, 174 F.3d 1077, 1085–86 (9th Cir. 1999) (interpreting same policy as *Stop & Shop*). We agree with them, and since Indiana has no case on point, we adopt *Stop & Shop*'s definition of "authorized representative" as "a person or company empowered to act on an entity's behalf." 136 F.3d at 74.

This describes Berry's relationship with Telamon well. Telamon authorized her to act on its behalf. She was its most sen-

ior person in New York and New Jersey, and she had operational oversight over the company's facilities in that area. She hired and fired employees, ran meetings, and signed contracts on Telamon's behalf. Indeed, she was engaged in large part to *be* an "authorized representative." Telamon arranged for her services in order to take advantage of her relationship with AT&T, one of its largest customers. Even Berry's title, Vice President of Major Accounts, reflects this role: AT&T was a "major account," and she was in charge of managing it.

Telamon resists this conclusion. In its view, unless Berry was authorized to do the *specific* activity that gave rise to the theft, she was not an "authorized representative." And since the Agreements did not expressly mention making contracts to sell equipment, it reasons that Berry lacked the requisite authorization. This view requires us to ignore reality. Even Telamon concedes that Berry's actual role grew over time to reach matters far beyond the Agreements' terms. It did not expect slavish adherence to the list of responsibilities in the Agreements, and so neither should we. Such an approach is inconsistent with the breadth of the list of exclusions. Moreover, even using the narrow definition of duties that Telamon prefers, it cannot prevail. Berry was spearheading the AT&T equipment removal program and was thus authorized to conduct the very activity that led to her crime. This also made her a person to whom Telamon "entrust[ed] the property for any purpose," since she was entrusted with the equipment she stole. An ordinary reader would understand that Berry fell within the exclusion, and thus that the Charter Oak policy did not cover the losses for which she was responsible.

## III

We turn now to Telamon's assertion that both insurers breached their duty of good faith, which is a standalone tort in Indiana. *Erie Ins. Co. v. Hickman by Smith*, 622 N.E.2d 515, 518–20 (Ind. 1993); *Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 975–76 (Ind. 2005). There are four well-established grounds for such a claim. *Hickman*, 622 N.E.2d at 519; *Magwerks*, 829 N.E.2d at 976. Telamon concedes that none of them applies to its case. It argues instead that the plaintiff should never have to establish the insurer's ill will and that there should be a fifth ground for the tort—bad faith in handling an insurance claim—even though it knows that this court has no power to change Indiana law. Telamon predicts that Indiana's courts are on the cusp of taking this step, however, and so it asks us to certify this case to the Supreme Court of Indiana.

Certification to Indiana's highest court is available if there is "an issue of state law that is determinative of the case and on which there is no clear controlling Indiana precedent." Ind. R. App. P. 64. Although we have the authority to certify questions when we conclude that the state-law issue "will control the outcome of a case pending in the federal court," Cir. R. 52(a), we do not take this step lightly. Telamon has not persuaded us that we should exercise our discretion here to do so. The principal cases on which it relied, *Hickman* and *Magwerks*, did leave open the possibility of expanding the grounds that would support the tort of an insurer's breach of the duty of good faith. *Hickman*, 622 N.E.2d at 519; *Magwerks*, 829 N.E.2d at 976. But it has been over 20 years since *Hickman* and over 10 since *Magwerks*, and the list has not expanded. We see no reason to ignore the Indiana Supreme Court's apparent satisfaction with the status quo, especially given the fact that

*Magwerks* explicitly refused to recognize the claim-handling ground for which Telamon advocates here. 829 N.E.2d at 976.

Against all this, Telamon points to two cases from the Indiana Court of Appeals: *HemoCleanse, Inc. v. Phila. Indem. Ins. Co.*, 831 N.E.2d 259 (Ind. Ct. App. 2005), and *Klepper v. ACE Am. Ins. Co.*, 999 N.E.2d 86 (Ind. Ct. App. 2013). Neither one persuades us that Indiana's courts have already taken the step for which Telamon argues, or that they are on the brink of doing so. A footnote in *HemoCleanse* cites *Magwerks* in support of an offhand remark that "an insurer may exhibit bad faith in, for example, its handling of the claim … ." 831 N.E.2d at 264 n.2. Yet that statement is incorrect—*Magwerks* expressly *rejected* that argument. *Klepper* is similarly unhelpful. After noting that *Magwerks* refused to recognize a claims-handling theory, the court again declined to do so in *Klepper*. See 999 N.E.2d at 98 & n.11. In the 23 years since *Hickman*, no Indiana court has embraced Telamon's theory. We certify questions only when the answer is unclear. That is not the case here.

Without a new exception, Telamon cannot succeed under this theory. We thus have no need to address its argument that its bad-faith claim does not require proof of ill will, or at least that Indiana law is unsettled on the point. We will comment only that this too looks like an uphill battle, in light of the observation in *Magwerks* that "[a]s a general proposition, a finding of bad faith requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will." 829 N.E.2d at 977 (internal quotation marks and alterations omitted). Nor does it matter whether, as Telamon argues, its evidence would permit a finding of ill will. Telamon finds it suspicious that Travelers determined in May 2012 that its loss

was not covered, but it did not share its decision until November 29, 2012, by which time it was too late to sue under the policy. Telamon also sees ill will in the decision to delay disclosure until after the Travelers adjuster spoke to his Charter Oak counterpart (recall they are part of the same corporate entity). Even viewed in isolation, we doubt this is a sufficient showing of ill will. But it does not stand alone. Telamon omits the obvious explanation for the delay and communication: It *asked* the insurers to coordinate their investigations. No rational finder of fact could find bad faith on such a flimsy basis.

## IV

The final question is whether the district court erred in dismissing *Telamon II*. The court rested this finding on claim preclusion principles. In deciding the preclusive effect of a federal-court judgment in a diversity case, the Supreme Court has adopted a two-part procedure. In principle, the effect to be given any federal judgment is a question of federal common law. See *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001). But when the earlier judgment rested on diversity (or another area where state law furnishes the rule of decision), "the federal court should … adopt as the federal common law rule of res judicata the rule of the state in which the court is located." *Allan Block Corp. v. Cnty. Materials Corp.*, 512 F.3d 912, 915 (7th Cir. 2008). Since nothing that justifies departing from the general rule comes to mind, we thus look to Indiana law to see what effect we should give to *Telamon I*.

Indiana bars parties from "split[ting] a cause of action, pursuing it in a piecemeal fashion and subjecting a defendant to needless multiple suits." *Hilliard v. Jacobs*, 957 N.E.2d 1043, 1048 (Ind. Ct. App. 2011) (citation omitted). Instead, "[m]ulti-

ple legal theories supporting relief on account of one transaction must be litigated at one go." *Erie Ins. Co. v. George*, 681 N.E.2d 183, 190 (Ind. 1997) (citation omitted). *Hilliard* is especially relevant, because it concerned insurance coverage. As in our case, the trial court rebuffed the plaintiff's attempt to add more claims to her complaint, and the plaintiff later filed a new suit "asserting previously-stricken claims based on the same facts and transaction as the first lawsuit." 957 N.E.2d at 1045. The Indiana Court of Appeals found that the second suit was barred by Indiana's rule against claim splitting, because although "the legal theories advanced have changed, the facts being litigated and the ultimate goal have remained exactly the same." *Id.* at 1048.

So too here. The claims in *Telamon II* are nearly identical to those the district court refused to permit Telamon to add to its complaint in *Telamon I*. That ruling was well within the district court's discretion, and in any event is not challenged here. That was a wise decision: Telamon missed the deadline to amend by nearly a year. At this point, however, the reason why the new claims were not advanced in the earlier case has fallen by the wayside. Under Indiana law, Telamon was not at liberty to split its cause of action and subject the insurers to repetitious lawsuits. A quick look at the policies at issue in *Telamon II* reveals that they are materially indistinguishable from those in *Telamon I*, and they were being invoked to cover the same loss. The district court was thus correct to invoke the bar against claim splitting.

## V

Berry's theft was not covered under either the Travelers or the Charter Oak policy. In addition, Telamon has not stated a claim for a breach of the duty of good faith. Finally, it was not

entitled to bring a new lawsuit that did no more than add a few additional insurers and policies to its basic case. The judgments of the district court are AFFIRMED.